THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. BRYANT LONG, Defendant-Appellee.

First District (6th Division)   No. 1—90—3462

Opinion filed July 5, 1991.—Modified on denial of rehearing August 30, 1991.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Carmen K. Aguilar, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellee.

JUSTICE LaPORTA delivered the opinion of the court:
Defendant Bryant Long was arrested and charged with the murder of his two children. On February 1, 1990, prior to trial, defendant moved to quash his arrest and to suppress evidence, including incriminating statements he had made to police on the ground that defendant did not knowingly and intelligently waive his *Miranda* rights.

The trial court granted defendant's motion to suppress statements made by him and found defendant could not have knowingly and intelligently waived his *Miranda* rights.

The State appeals, alleging that the trial court erred in granting defendant's motion to suppress.

Defendant was charged with the first degree murder of his daughter Cord Long, who died of suffocation on June 6, 1989. Defendant was also charged with the first degree murder of his daughter Charnelle, who died on the same date in a fire started in

their Chicago home. Defendant also was charged with arson and aggravated arson.

On February 1, 1990, defendant filed a motion to quash his June 30, 1989, arrest and to suppress evidence obtained as the product of his arrest including incriminating statements made by defendant, the names of witnesses and physical evidence. Defendant also filed a motion to suppress any and all oral or written statements made by defendant prior to the time of his arrest or subsequent to his arrest, contending that he was unable to appreciate and incapable of understanding the full meaning of his *Miranda* rights.

The evidence on defendant's motion heard by the trial court included a report filed by a staff psychiatrist from the Psychiatric Institute of the Circuit Court of Cook County, Matthew S. Markos, in which he stated that he was unable to render an opinion on Long's ability to understand the meaning of *Miranda* rights because of the "inconsistency of [Long's] reports with respect to his involvement in the alleged offense and *** the fact that the exact nature of his cognitive deficits is perhaps unclear."

Psychologist Karen P. Smith, who was also an attorney, testified for the defense and filed a report summarizing the results of the testing she performed. Her report stated, in pertinent part, that on December 15, 1989, defendant was 29 years old, "had a history of special education due to mental retardation" and had no prior experience with the criminal justice system. "Although alert and oriented as to time, place and person, Mr. Long's understanding of the purpose of our visit seemed tenuous. His report of the arrest incident was circumstantial and difficult to follow, and Mr. Long was unable to tell this examiner the name of the charge against him. When asked questions about various aspects of his case, Mr. Long often gave the impression of trying to answer, only to draw a blank after mumbling incoherently.

On the day of the testing when I questioned Bryant Long about his case, and specifically about his experiences with police, he was unable to tell a coherent story of what happened. When I asked him if he understood what it meant to 'have the right to remain silent,' he could supply no answer at all. *** It was my impression during the interview, confirmed by the defendant's performance on intelligence testing, that the concept of a 'right' was much too abstract for him to comprehend on his own. Many of the other words contained in the *Miranda* warning seemed beyond the reach of Mr. Long's very limited vocabulary, and would have required explicit ex-

planation for him to have understood them at the time of his arrest."

The report summarized her findings, stating that she believed defendant was emotionally immature, needed to depend on others, had poor practical judgment and lacked the capacity to understand *Miranda* warnings. Smith testified that her report was based not only on her interviews with him but also on a review of his elementary and high school records of his special education classes, police reports pertaining to the investigation of the case and intelligence tests done on defendant when he was eight years old that indicated an IQ of 56.

Smith testified that her intellectual tests on defendant showed an IQ of 67. Smith testified that her screening ruled out any brain damage or psychosis. She testified that defendant was "functioning in a mildly retarded range of intellectual functioning."

On cross-examination, Smith acknowledged that defendant lived with his wife and three children in a home without any other adult supervision. She testified that defendant told her he had been employed in the past at a "fast food place, a fried chicken place." She acknowledged that defendant knew enough to know that two young children should not play with matches and that the only matches in his house were kept on the refrigerator.

Smith stated that defendant's speech was "surprisingly poor." She stated: "When I did ask him to tell in his own words what had happened and how he happened to be where he was, it was very confusing, the account. I found myself having to ask questions to get why he was talking about one thing instead of another. He didn't give a good narrative."

On redirect examination she stated that she asked him what it meant to "remain silent" but she never explained the *Miranda* rights further or attempted to break down the rights into simpler language to see if defendant would understand those simpler words.

Detective Michael Kill testified that defendant voluntarily accompanied him to the police station on the day of the fire and deaths of his children, June 6, 1989, where Kill read defendant his *Miranda* rights once through and then again, asking defendant if he understood each right individually. Kill testified that in each instance, the defendant responded, "Yes." Through a series of questions and answers from the prosecutor, Kill told the court how he then further explained the *Miranda* rights to defendant in simpler language.

"Then I went: Do you understand that anything you say may be used against you in court or other proceedings. I told him anything he tells me, not only may it be used against him in court; that if he did something wrong, it would be used against him in court. \*\*\* And I told him that he had a right to the lawyer and he didn't have to answer anything. And if he needed one, we would contact one or if he had a choice of one. And if he didn't have a choice of one, then I would stop right there. \*\*\* I said if you cannot afford or otherwise obtain a lawyer if you want one, a lawyer will be appointed to you and we will not ask questions until he has been appointed. Again I told him without his attorney, I wouldn't talk to him and that would be it. That he didn't have to say anything. And at that point, he wanted to start the conversation right there. But I wanted to finish what I was doing to make sure he understood each one \*\*\* I told him, if I start talking to you and it becomes apparent to you that you suddenly think you want an attorney, to tell me and we will stop right there and we won't ask any further questions at that point. In other words, he could stop—I told him, you can stop me me [sic] from asking you anything at any time and I will just stop and leave the room. And he said he still wanted to talk to me."

Kill testified that in the 90 minutes he interviewed defendant, defendant told him facts in a chronological manner and understood and answered questions about his children's inability to climb up and get matches off of the refrigerator. Kill testified that defendant's speech was "deliberate" and not slurred. Kill testified: "His sentence structure was that which I found comparable to a person who achieved a freshman year of high school education."

Kill acknowledged that defendant never heard, read or signed the summary of his statement that Kill prepared during the interview. Defendant's sister, Felicia Brooms, also testified that her brother voluntarily went with Kill to the police station.

Assistant State's Attorney Diane Dickett testified that she too interviewed defendant on the day he was arrested, about 15 to 20 minutes after Kill finished his interview. She stated that she gave defendant his *Miranda* rights, saying each individually and asking him if he understood each. She stated that the only deviation she made from the *Miranda* wording was to explain to defendant that "attorney" meant lawyer and that "appoint" meant they would get him a lawyer. Dickett was asked, "After he indicated to you that he understood his rights, did you ask him anything further?" She replied, "Yes. I asked him if he was willing to tell me about what

happened." Then Dickett was asked, "Did he respond to you at that time?" And she replied, "He said he would tell me about the fire."

She stated that when he told her about the fire, he spoke in a coherent and chronological fashion and had no difficulty speaking. She acknowledged that before she spoke to defendant, Kill told her not to ask compound questions because defendant was slow. Kill remained in the room when she interviewed defendant.

On November 2, 1990, the trial court granted defendant's motion to quash. The court found that defendant was not coerced into giving a statement but that he was incapable of knowingly and intelligently waiving his *Miranda* rights.

The trial judge stated that she was impressed with Smith's testimony. The judge stated: "She did tell this court that when she discussed the various *Miranda* rights with Mr. Long that he looked blank and scratched his head, and it was obvious to her that he did not understand his rights." The court granted the motion to suppress defendant's statements and the State filed a motion to reconsider which was denied. The State appealed, contending the trial court erred when it granted defendant's motion to suppress statements made by defendant.

■■ The purpose of advising an accused of his rights is to enable him to make an intelligent decision, and to understand the consequences of that decision, and the fact that the advice was given and repeated and he said he understood it is of little consequence unless the defendant possessed the intelligence to understand the warning. (*People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27.) Each case must be considered on its own facts, and mental deficiency, while not decisive, is a relevant factor. *Turner*, 56 Ill. 2d at 206.

Defendant contends his situation is similar to that of the defendant in *Turner*. *Turner* is distinguishable on its facts from this case. The defendant in *Turner* made no incriminating statement prior to being closeted with the polygraph examiner. He stated to the examiner that he thought he should have a lawyer but then proceeded with the polygraph test without consulting an attorney. The interrogation should have stopped when he indicated he wanted an attorney.

The trial court found defendant's case "on all fours" with *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958. In *Bernasco*, the court found a 17-year-old defendant's confession was inadmissible because defendant did not knowingly and intelligently waive his *Miranda* rights. Defendant Bernasco, as with defendant

Long in this case, was of subnormal intelligence, had left school after the ninth grade and had no prior experience with police. At Bernasco's suppression hearing, a psychologist testified that Bernasco could not understand certain *Miranda* terms and the defendant testified himself that he had not paid attention to his *Miranda* waiver form and had not understood it. The Illinois Supreme Court upheld the suppression of defendant's confession, stating that "to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *Bernasco*, 138 Ill. 2d at 363.

On appeal, defendant relies on the *Bernasco* decision, noting that it was reasonable for the trial court to find more credible the opinion of a psychologist than the police officer and assistant State's Attorney. Defendant also discounts the State's contention that the psychologist's report was somehow of lesser value because the interviews and testing took place five months after defendant's arrest. Defendant argues that nothing in the record suggests defendant's intellectual ability was impaired as a result of the delay, for the psychologist was testing his cognitive abilities, not his memory.

We disagree. Smith asked defendant to relate his experiences with the police at the time he was taken into custody some five months before. Clearly she was testing his memory as well as his cognitive abilities.

The State contends this court should reverse the trial court's order suppressing defendant's statements because the trial court's finding is unsupported by the evidence and because the trial court incorrectly based its decision on *Bernasco*, which is not "on all fours" with the present case. Moreover, the testimony of the detective and the assistant State's Attorney who took defendant's statement establishes that defendant gave the statements after being fully advised of his *Miranda* rights twice and after having those rights explained in terms sufficient to allow defendant to knowingly and intelligently waive those rights.

Specifically, the State contends that Smith's testimony was weak because she interviewed defendant for a two-hour period some five months after he was arrested and she did not "extensively" examine his background. The State contends that a review of his background establishes that defendant was accustomed to functioning day to day without adult supervision. In addition, Smith testified that defendant understood the concept of a lawyer.

The State points to the evidence presented through the testimony of Kill and Dickett, who both testified that they took special care to advise defendant of his *Miranda* rights in language he could understand and that defendant answered questions. Both testified that defendant stayed calm and exhibited no stress while being questioned since he did not need his inhaler for his asthma while being interviewed.

The State argues that the court should have considered not only defendant's mental capacity, but also defendant's age, physical condition, the length and intensity of the interrogation and whether any coercion was involved. (*People v. Madden* (1986), 148 Ill. App. 3d 988, 996, 501 N.E.2d 1297.) The trial court specifically found no coercion was involved when defendant gave his statement. He was in custody and interrogated for only a few hours by police before he gave the incriminating statements.

The State distinguishes *Bernasco* initially by noting that the defendant in *Bernasco* was 17 and living with his father. Here, defendant was 29 and living together with his wife and three children without any adult supervision. In addition, the trial court in *Bernasco* heard testimony from a school psychologist, but here Smith had only school records to look at and did a minimal review of defendant's background.

The State argues that the most obvious distinction between the two cases is that in *Bernasco* the defendant himself testified about what he understood and how he felt. Here, defendant did not testify. The trial judge acknowledged this difference when hearing arguments on the motion to reconsider. She noted that she had seen Mr. Long on several occasions and had the opportunity to observe him. "My personal observations of Mr. Long would be that he appears very slow. I have given him directions and he reacts very slowly to very simple directions. He stares off blankly during the court proceedings ***."

The resolution of contradictory testimony and determination of its weight is for the trier of fact. (*Madden*, 148 Ill. App. 3d at 1000.) And findings of the trial court on a motion to suppress will be affirmed unless contrary to the manifest weight of the evidence. *People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181.

Though *Bernasco* outlines the supreme court's most recent explanation of the test for a knowing and voluntary waiver of *Miranda* rights, it is clearly distinguishable from the facts of this case. In *Bernasco*, the defendant, age 17, still dependant on his father and living at home, was handed a copy of the standard

*Miranda* rights to read along with the officer. The officer had defendant initial each section as the rights were read to him. Bernasco was asked if he understood his rights and he said, "Yes." He then signed a waiver of rights form witnessed by two detectives. Bernasco himself testified that he did not understand his rights as listed on the piece of paper handed to him, was scared and was not paying attention.

The defendant here did not testify at the hearing on the motion to suppress. The trial judge stated that during the hearing on the motion she had observed defendant's inattentiveness and slow reaction to directions. But we believe such observations are not an appropriate test to determine whether a person has "knowingly and intelligently" waived his *Miranda* rights.

Defendant also cites *People v. Reid* (136 Ill. 2d 27, 554 N.E.2d 174) for our consideration of whether he knowingly and intelligently waived his *Miranda* rights. In *Reid*, the Illinois Supreme Court held that the circuit court's decision to deny defendant's motion to suppress his pretrial statements because defendant had knowingly and intelligently waived his *Miranda* rights was not against the manifest weight of the evidence.

Defendant Reid was found guilty of armed robbery and murder. Before the 15-year-old's trial, defendant moved to suppress statements he made to police on the ground that he did not knowingly and intelligently waive his *Miranda* rights. Evidence adduced at the suppression hearing indicated that defendant was read the *Miranda* rights on several occasions and they were shown to him in written form. His mother was present during the interrogations.

Defendant had the reading and comprehension skills of an eight-year-old. He testified that he understood the meaning of several words including lawyer, silent, can, will, used, against and present, all words used in the *Miranda* warnings. Evidence established that defendant had no prior experience with the criminal justice system, had never worked and had always lived at home with his family.

In *Reid* the trial court found no reason to suppress defendant's statements. This decision was upheld on appeal. The defendant in *Reid* lived in a much more sheltered environment than our defendant. Here, defendant had both lived and worked outside the home for several years. Though Reid was given the *Miranda* warnings verbatim, the defendant here was given both the verbatim *Miranda* warnings and a simplified explanation of each warning.

Dickett testified that defendant's warnings were given orally because defendant indicated he could neither read nor write.

Though Dickett deviated only briefly from the standard *Miranda* warnings, Kill's explanation of rights was much more extensive and occurred in the same interrogation session. Kill's testimony demonstrated that the language used to explain the defendant's rights was simplified from the formal language of *Miranda* to a level easily understood by defendant.

In addition, Dickett testified that she asked defendant if he wanted his statement to be put into writing and defendant "indicated that he did not wish that." This indicates defendant had the ability to make choices.

We do not find the same persuasiveness in Smith's testimony, which the judge relied upon heavily. By her own admission, Smith only asked defendant if he knew what it meant to "remain silent." She testified that she did not explain the *Miranda* rights further or attempt to break down the formal language of the *Miranda* rights into simpler language to determine if defendant would understand them when translated into simpler words within his ability to understand. We note that Smith determined the defendant had an IQ of 67 and concluded that "he functioned in a mildly retarded range of intellectual functioning." This IQ does not render him incapable of any ability to ever understand his privilege against self-incrimination if it is explained in language he can comprehend.

The *Miranda* Court enunciated the mandatory warnings to be given a defendant before a custodial interrogation could take place:

> "He must be warned ·prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. [5] Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." (*Miranda v. Arizona* (1966), 384 U.S. 436, 479, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.)

The standard warnings given by the police track the specific language of the Supreme Court.

This language was the basis for the psychologist's questions to test defendant's understanding. Smith concluded that he did not understand the concept of a "right," which was too abstract for him to comprehend on his own, and that many of the other words in the

*Miranda* warnings would have required explicit explanation for defendant to understand them.

In contrast to Smith's questioning put to the defendant, Kill then testified extensively about the manner in which he explained defendant's rights to him, telling him that they could stop talking whenever defendant wanted and that if defendant wanted a lawyer, they would stop talking and Kill would obtain one for him. The comparison between knowing what it means to "remain silent" and advising defendant they could stop talking whenever defendant wanted or would stop talking if defendant wanted a lawyer is the difference between the formal language of *Miranda* and its simplest translation.

The record establishes that Kill translated the *Miranda* warnings into simple language as follows: (1) You have the right to remain silent—"I told him, you don't have to talk to me about the death of your children if you don't want to." (2) Anything you say may be used against you in court or other proceedings—"I told him, anything you tell me, not only may it be used against him in court, but if he did something wrong it would be used against him in court." (3) You have a right to talk to a lawyer before we ask you any questions and to have him with you during questioning—"I told him, he had a right to a lawyer and he didn't have to answer anything. And if he needed one, we would contact one or if he had a choice of one. And if he didn't have a choice of one then I would stop right there." (He said he didn't want a lawyer present at that time.) (4) If you cannot afford or otherwise obtain a lawyer, if you want one, a lawyer will be appointed to you and we will not ask questions until he has been appointed—"I told him, without his attorney I wouldn't talk to him and that would be it. That he didn't have to say anything." (He said he didn't want a lawyer.) (5) If you decide to answer now with or without a lawyer, you have the right to stop questioning at any time or stop questioning and consult a lawyer—"I told him, if I start talking to you and it becomes apparent to you that you suddenly think you want an attorney to tell me and we will stop right there and we won't ask any further questions at that point. In other words, he could stop me from asking anything, at any time and I will just stop and leave the room." (He said he still wanted to talk to me.)

Dickett testified that she gave defendant the *Miranda* warnings one at a time, speaking slowly. After each one she asked defendant if he understood and he said he did. She testified that she told him the word attorney meant lawyer and instead of the phrase, "ap-

point a lawyer," she told him the court would give him a lawyer.

In contrast to this questioning by Kill and Dickett, Smith testified that she interviewed defendant on December 15, 1989, six months after the fire. In questions she posed which were intended to determine "whether or not he could intelligently waive what are commonly known as 'Miranda rights or Miranda warnings,'" she would ask him "what does this mean, and then I would say what the particular right was" and his reaction would be to "look around, scratch his head and draw a blank. He didn't say anything." From these reactions she concluded that "he didn't understand what these rights meant."

The contrast in the manner in which the police officer and assistant State's Attorney advised the defendant and the form of the questions posed to the defendant by the psychologist lead us to the conclusion that the record does not support the trial court's conclusion that defendant did not understand his rights and therefore did not knowingly and intelligently waive them. The court's grant of defendant's motion to suppress is not supported by the record.

■ Here we find the defendant was advised of his right to remain silent and his right to have an attorney present in language he could understand. He was advised that anything he told the officer could be used against him in court. Defendant then stated that he wanted to tell the police about the fire. He repeated the story to the officer and to the assistant State's Attorney in a coherent manner. Although he was asked to do so, he chose not to have his statement taken down verbatim in writing. Since he was unable to read, he could not verify what a written statement contained.

While the State has a heavy burden to show that a defendant has waived his constitutional rights in a knowing, intelligent and voluntary manner (*Brownell*, 79 Ill. 2d at 516), we find the State has met that burden. We find the weight of the evidence establishes that defendant waived his *Miranda* rights in a knowing and intelligent manner. For all of the foregoing reasons, the order of the trial court granting defendant's motion to suppress his statements is reversed.

Reversed.

RAKOWSKI, P.J., and EGAN, J., concur.