THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
TROY HIGGINS, Defendant-Appellee.

Fifth District   No. 5—91—0768

Opinion filed January 25, 1993.

Charles Grace, State's Attorney, of Murphysboro (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE WILLIAM A. LEWIS delivered the opinion of the court:

Defendant, 17-year-old Troy Higgins, was charged with arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1(a)) and two counts of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)). The defendant filed a motion to suppress his confession, and the circuit court, in granting the motion, found that the confession was not voluntary and that defendant did not knowingly and intelligently waive his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The State appeals.

On appeal, although the State presents its case in four separate arguments, the issues to be considered are whether the court's determinations that the defendant's statements were not voluntary and that the defendant did not knowingly and intelligently waive his rights were against the manifest weight of the evidence. (These same issues are also paramount in another case also decided by this court today, *People v. Giacomo* (1993), 239 Ill. App. 3d 247. When the case at bar and *Giacomo* are read in tandem, these cases provide a sharp contrast in the totality of the circumstances and emphasize that the validity of a confession is to be determined from the particular facts of each case. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958).) We affirm the trial court for the reasons set forth below.

On February 16, 1991, a fire occurred at a residence in Carbondale, Illinois, at approximately 11 p.m. As a result of the fire, two occupants, Herschel Scott and Willie Rosemand, died. The defendant was arrested on an unrelated battery charge on February 18, 1991, but while in custody, he was questioned on and ultimately confessed to setting the fire at this residence. At the time of his arrest, the defendant was 17 years of age, had an IQ of 67, and was in special education classes in school. After filing the arson charges, the State filed a motion to appoint an expert to evaluate the defendant's fitness to stand trial. A trial on the defendant's fitness was held, and a jury found the defendant fit to stand trial. Subsequently, the defendant filed his motion to suppress.

Don Priddy, a Carbondale police officer, testified at the suppression hearing that on February 12, 1991, he investigated a battery, allegedly committed by the defendant. Priddy did not see the defendant at that time but encountered him on February 17, 1991, shortly after midnight. Priddy knew the defendant was on home confinement and was not to be out of his home except to attend school. Priddy did not give the defendant his *Miranda* warnings, but he asked the defendant where he had been that night. Defendant responded that he had been

at Penny Wooley's house. Priddy asked the defendant to come to the police station because of his home confinement violation. As Priddy was talking to the defendant, the defendant's grandmother came to the door. Priddy told her that the defendant was not to be out of the house, that he was taking the defendant to the police station to question him about a battery, and that he would bring the defendant home when they were finished. The defendant's grandmother, Queenie, told the defendant to go with Priddy and to give him a statement.

Priddy read the defendant his *Miranda* rights from a form at the police station, but he did not ask the defendant after each warning whether he understood. Priddy asked the defendant about the battery, and the defendant told him that Miss Berner started the fight and that he was defending himself. During the interview, Detective Corey came in, briefly asked the defendant about the fire of February 16, 1991, and then left. The interview with the defendant lasted about an hour, and then Priddy took the defendant home.

Carbondale Detective Donald Barrett testified that he arrested the defendant on February 18, 1991, at the Carbondale East High School pursuant to a warrant for the battery. Barrett was aware that the defendant had given Priddy several "stories" as to his whereabouts on the night of the fire, the last one being that the defendant had been at a house on South Washington Street. Therefore, Barrett drove the defendant down South Washington Street, an indirect route to the police station, for the purpose of having the defendant point out the house where he had been on the night of the fire. The defendant was unable to do so.

Barrett then took the defendant to the police station where he read the defendant his rights from a form. Barrett asked if the defendant understood after each admonishment, and the defendant answered affirmatively. Barrett did not explain the rights on the form. Barrett inquired into the defendant's whereabouts the night of the fire and asked about the three different statements he had given to Officer Priddy. The defendant admitted the last statement he gave to Priddy was a lie and stated that the reason he had lied was because he was joking with Priddy. The defendant told Barrett that, on the day of the fire, he spent most of the afternoon at Stanley Schauf's apartment, left for awhile, but then returned to Schauf's about 8 p.m. and stayed until around midnight.

Barrett had received incorrect information that Priddy had found a cigarette lighter on the defendant on February 17, 1991. Barrett asked about the lighter, and initially, the defendant said he had a lighter; however, the defendant then stated that while he did not have

a lighter, he had matches. Barrett told the defendant he believed the defendant had been at the scene of the fire and had been involved. The defendant denied this.

Barrett asked the defendant to take a polygraph examination, and the defendant agreed. Before the defendant took the polygraph examination, Barrett found out that the defendant had been at Schauf's apartment on the night of the fire, but that he had left there about 10 or 10:30 p.m.

Barrett took the defendant to the crime laboratory and was present when the defendant signed a consent form for the polygraph examination. Barrett testified that the defendant was not given his *Miranda* warnings before the polygraph examination but that Craig Hansen, who administered the polygraph examination, read a consent form to the defendant. The defendant signed the form, and Barrett signed as a witness.

After the polygraph examination, the defendant told Barrett, Hansen and Detective Corey that he had been playing with matches at the house and that he had started the fire by accident. No admonitions were given to the defendant before he made this statement.

Barrett drove the defendant to the scene of the fire after leaving the crime lab. The defendant refused to get out of the police car, but he directed Detective Corey to the spot where he had stood on the night of the fire. The defendant first placed Corey in the front yard in front of the house at the west end of the porch and said he threw matches onto some cardboard on the porch. The defendant then changed this statement and said he was on the porch. Corey corroborated that there was cardboard on the porch as he had been at the house earlier in the day on February 16, 1991, to investigate a stabbing. Barrett returned the defendant to the police station, where defendant made a statement admitting he had started the fire by throwing matches onto the cardboard on the porch.

Barrett testified that since he had independent knowledge that a window was broken and that the fire had started inside the house beneath this window and not on the porch, he accused the defendant of breaking the window. The defendant acknowledged that there was a broken window at the house, but he denied that he broke it. Barrett stopped the interview about midnight, after the defendant refused to make a taped statement because he was too tired.

The next morning, on February 19, 1991, at about 10:17 a.m., Barrett, accompanied by Detective Corey, continued his interview with the defendant. At the beginning of the interview, Corey orally and informally advised the defendant of his rights. Barrett also no-

ticed that the defendant had a cut on his arm which had been covered by a long-sleeved shirt the day before. This prompted Barrett to question the defendant again about the broken window and to ask about the cut on his arm. The defendant denied he received the cut from the broken window, but he admitted he "flicked" two matches through the broken window.

Barrett discontinued the interview with the defendant to view a videotape of the fire. In the videotape, Barrett saw that the water faucets in the bathroom and in the kitchen had been left running.

Barrett resumed the interview with the defendant after the videotape, with Officer Echols being present. Echols was introduced to the defendant by Barrett as being a fingerprint expert. Barrett then told the defendant that the water faucets had been turned on at the scene of the fire, that Echols had obtained fingerprints from the water faucets, and that the fingerprints matched the defendant's, even though no fingerprints had been obtained from the scene of the crime. After Barrett told the defendant about the fingerprints, the defendant admitted that he went inside the house and turned on the water faucets.

Barrett accused the defendant of not taking this matter seriously and showed the defendant photographs of the scene of the fire, which revealed the burned bodies of the victims. Barrett stated that, after this, the defendant became like a "whipped puppy." The defendant then confessed to being inside the house, starting the fire, attempting unsuccessfully to wake Scott up after the fire began, turning on the water faucets, and panicking and leaving the house after the fire started to increase in size.

Barrett taped the defendant's confession. The tape recording and the transcription of the recording were not admitted into evidence because, for a period of time, the tape was unaccounted for and hence there was a chain-of-evidence problem.

Barrett admitted on cross-examination that he knew the defendant was in a special class at school, but he did not know any details about the class. Barrett knew the defendant was "slow," but he did not inquire into his reading ability.

Detective Randy Corey testified that he was present for the taping of the defendant's statement on February 19, 1991, and that he had advised the defendant orally of his rights before the taping. Corey had not, however, obtained a written waiver from the defendant. Corey was also unable to recall exactly what he had said to the defendant when he gave him his rights.

Craig Hansen, who was employed by the Illinois State Police in the Bureau of Forensic Science, testified that he met with Detectives

Barrett and Corey and the defendant on February 18, 1991, at about 7 p.m., at the Southern Illinois Forensic Center in Carbondale to administer a polygraph examination to the defendant. Hansen gave the defendant a consent form to read and sign before talking to him. It was Hansen's practice to give the consent form to the person, to step out of the room so the person could review the form, and then, when he returned, to ask the person if he had any questions. Hansen followed this procedure with the defendant. According to Hansen, when he returned to the room, the defendant indicated he had concerns regarding the statements on the form about having his statement videotaped and monitored. Hansen scratched out that portion of the form and underlined other portions of the form which the defendant had concerns about but which Hansen said he explained.

Hansen was told that the defendant was "slow" before he gave the defendant the consent form, but he was not told that the defendant was mentally handicapped. Hansen did not explain the consent form to the defendant before the defendant read it. Hansen explained that, because the defendant was 17 years of age, he was required to have a statement of consent from the parent or legal guardian. Hansen gave the statement-of-consent form to Corey, who took the form to defendant's grandmother to sign.

Hansen testified he advised the defendant orally of his *Miranda* rights before administering the polygraph examination at the time that he had given the defendant the consent form, but Hansen was unable to recall exactly what he had said. He did not obtain a written waiver from the defendant. Hansen stated Barrett and Corey told him they had given the defendant his rights before coming to the lab.

After the polygraph examination, Hansen told the defendant that the test showed clearly that he was not telling the truth. Up until this time, the defendant had denied setting the fire, but after the test, the defendant confessed to setting the fire.

On cross-examination, Hansen could not recall if he had inquired about the defendant's ability to read or if he had explained the *Miranda* rights to the defendant. Hansen admitted he did not tell the defendant that the results of the polygraph examination were inadmissible in court.

The State also presented the testimony of seven other law enforcement officers, who testified about their contacts with the defendant from 1985 until 1989. None of the officers testified positively that the defendant had been given *Miranda* warnings during any of these contacts, which consisted primarily of curfew violations or possession

of stolen bicycles. Additionally, most of the officers ended the encounters by taking the defendant home to his grandmother.

Jeffrey Kellogg, a psychologist, testified he conducted a fitness examination of the defendant in April 1991. Kellogg determined the defendant did not suffer from any emotional or psychological disorder other than mild mental retardation. An intelligence test Kellogg administered to the defendant revealed that the defendant's IQ (intelligence quotient) was between 50 and 70. Kellogg found the defendant's sight-reading ability (but not for content), spelling, and mathematical skills were between a second- and third-grade level. Kellogg was aware that the defendant was in a special education class at school.

Kellogg was impressed in his interview with the defendant by the defendant's cooperativeness. He stated that when the defendant did not understand, the defendant would ask or tell him; otherwise, he responded to the content of his questions. Kellogg determined that the defendant's sense of time is easily confused, and that you have to plot things in his experience by referring to a happening rather than to a specific time.

Kellogg stated that generally, mentally handicapped persons "expect the world to be a safer and more honest place than nonretarded people." Thus, an unfamiliar setting, unless frightening, might seem supportive to the individual. Kellogg also stated that leading questions to a mentally handicapped person could produce an interview the police wanted, and a mentally handicapped adolescent may say "yes" to statements of the police just to get out of a situation quickly.

It was Kellogg's opinion that the defendant had the ability to waive and that he understood his *Miranda* rights, since his rights had been given repeatedly to the defendant, since the defendant had prior experience with the police, and since the officers explained the rights to him at the taped interview. Kellogg stated that the vocabulary in the *Miranda* warnings would be beyond the defendant's comprehension, but that simplification and repetition would help him understand.

On cross-examination, Kellogg agreed that rote recitation of the *Miranda* rights is not appropriate with the defendant, and that the reading of the rights and defendant responding affirmatively would not indicate that the defendant knowingly and competently waived his rights. Similarly, a written waiver would create problems for someone of defendant's intellectual capacity. Kellogg also admitted that a material misrepresentation could make a retarded person confess to a crime he did not commit. It was Kellogg's understanding that the defendant had been interviewed by the police at least a half a dozen

times, and that he had been given his *Miranda* warnings on those occasions.

Paul Brinker testified that he is employed by the Department of Children and Family Services (DCFS). DCFS became guardian of the defendant in 1984; however, the defendant lived with his grandmother, and she controlled the defendant's educational needs. Brinker knew the defendant was in a life-skills program.

Brinker received a call on February 18, 1991, from Cathy Shimp advising him that the defendant had been arrested. Brinker called the Carbondale police department and talked to Lieutenant Hill. Brinker told Hill that DCFS was the defendant's guardian and asked if the defendant wanted an attorney. Lieutenant Hill told Brinker that the defendant had already made a statement and he did not need or want an attorney. Hill advised Brinker the defendant had been arrested on a battery complaint only and said nothing regarding the arson charge.

Dr. Michael Althoff, a psychologist, testified that he had done a psychological evaluation of the defendant in April 1991. The results of this evaluation revealed that the defendant's understanding of his rights was minimal and that there were significant problems with his ability to waive these rights. Althoff found that when the defendant is unsure, he will state affirmatively that he understands even when he does not. He also found that the defendant is subject to undue influence and that he would tend to say what is suggested he should say. Althoff explained that language is frequently a barrier in dealing with mentally handicapped individuals.

Althoff stated that the defendant would have significant problems in understanding a *Miranda* form and the consent form presented to the defendant by Hansen. It was Althoff's opinion that it would be difficult for the defendant to read the consent form in its entirety, and even if someone read the form to defendant, there is no guarantee that the defendant would understand it. When asked specifically about the line on the consent form which Hansen said he had scratched out at the defendant's request after he read the form, Althoff noted that the defendant would not understand the words "educational," "research," "consent," "monitoring," and "examination" and possibly other words contained in the statement.

The defendant testified that he has never testified in court and that he has never been in jail before. The defendant could not recall reading or signing the rights form. He also could not recall talking to anyone after his arrest or talking to the two officers and being tape-recorded. When asked to read a rights form, the defendant read the form as follows:

"You have the right to remain silent. Any attorney you say can and will be hold against you in—you against you in court of law.

* * *

You have—you have the right to talk to a lawyer and have him present with your—rights—you are began questioning. If you cannot afford to hire a lawyer, one will be appointed to you, represent you for, before any questioning, if you wish. You can decide that any time of exercise these rights and not also any questions you may or, or may any, any statements.

* * *

I have right—read—I have right—read the about statements. If may right and any—what is this word?

Q. [THE COURT] Understand.

A. Understand each of those rights."

When asked to tell the court what the rights were that he had just read, the defendant responded:

"You have the right to remain silent. Anything can be in court—

* * *

You have to remain silent. Anything could be held against you in court of law.

Q. [THE COURT] What does that mean?

A. I don't understand what that means.

Q. Tell me the rest of your rights that you just read to me.

A. If questioning—if we—what is that, questioning? I don't understand."

The defendant also indicated he did not understand the admonishment that he could exercise his rights at any time and not answer questions. When asked to read the consent form provided by Craig Hansen and the consent form he signed for Dr. Althoff, the defendant also exhibited great difficulty in reading these documents. Defendant's understanding of a polygraph examination was that "they hook the things up to you."

Following this hearing, the court entered an extensive order stating the facts of the case and its findings. As was noted at the beginning of this opinion, the court held that the defendant's statements were not voluntary and that he did not knowingly and intelligently waive his rights. We now consider the State's appeal.

The State's first contention is that the court's determination that the defendant did not knowingly and intelligently waive his rights is against the manifest weight of the evidence. The State argues that

the defendant's understanding is shown through Kellogg's testimony that defendant was "pretty good" at figuring out the meaning of words that he heard spoken to him, that the defendant had the ability to waive his rights, and that he understood what he was doing when he waived those rights. The State also notes that the defendant had been advised of his rights five times, that each time he indicated he had understood those rights, and that each time he had an opportunity to inform the officials that he did not understand his rights. The State further argues that the police officers testified that the defendant appeared to understand and gave appropriate responses to the questions. Additionally, the State alleges the defendant exhibited understanding when he told Hansen he disagreed with having his polygraph examination videotaped and had Hansen strike that language from the consent form. The State also points out that the defendant's initial denial is consistent with his understanding of his rights and exhibits the defendant's overt attempt to escape culpability. We disagree.

The supreme court, in *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958, discusses extensively the constitutional requirements that a defendant must knowingly and intelligently waive his rights in *Miranda*-type situations and, in addition, that the waiver or confession must also be voluntary. *Bernasco*, in a case factually similar to this one, also involved a 17-year-old defendant with subnormal intelligence and a fourth-grade reading and comprehension level. The supreme court in *Bernasco* stated that for a defendant to make an intelligent and knowing waiver, there must be an intentional abandonment of the privilege, a defendant must know what he is doing, and he must understand both the nature of the right and the consequence of the decision to abandon it. (*Bernasco*, 138 Ill. 2d at 360, 562 N.E.2d at 962-63.) The supreme court also stated that, at a minimum, "to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." (*Bernasco*, 138 Ill. 2d at 363, 562 N.E.2d at 964.) In reviewing a court's determination that a defendant's waiver of rights was knowingly and intelligently made, the reviewing court will not reweigh the evidence but will consider only whether the court's decision was against the manifest weight of the evidence. (*Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958.) The court also noted in *Bernasco* that whether a defendant intelligently waived his rights is essentially a question of fact for the trial court. (*Bernasco*, 138 Ill. 2d at 368, 562 N.E.2d at 966.) We conclude that the trial court's determination that

the defendant did not knowingly and intelligently waive his rights was not against the manifest weight of the evidence.

Both psychologists testified that a rote reading of the *Miranda* rights to the defendant would be problematic to the defendant's understanding of his rights and that many of the words contained in the rights would be beyond the defendant's understanding. Kellogg testified that repetition and simplification may aid the defendant's understanding of his rights. Althoff testified that the defendant may say he understands his rights even when he does not.

■ The evidence does not show that the defendant was advised of his rights repeatedly or that the admonishments were given in a form sufficient to provide him with an understanding of what his rights were that he was to waive. Officer Priddy admonished the defendant by reading the form to the defendant, but Priddy neither inquired after each admonishment if the defendant understood, nor did he attempt to explain or simplify the rights. Similarly, Detective Barrett read the rights from the waiver form and did not simplify or explain further these rights to the defendant; however, he did ask the defendant after each admonishment if he understood.

Hansen testified that he advised the defendant of his rights before he administered the polygraph examination to the defendant, but he was unable to recall what he had said, and he obtained no written waiver from the defendant. In the same vein, Detective Corey advised the defendant of his rights informally before the defendant gave his tape-recorded statement, but he, too, did not obtain a written waiver and was unable to recall his wording of the rights to the defendant. These advisements are consistent with the trial court's conclusion that they were insufficient to provide defendant with an understanding of his rights when defendant's age (17 years of age), his education (in the eleventh grade, but in a special education class in which he was learning life skills), and his intelligence level (an IQ of 67 or less and a second- or third-grade functional level) are considered.

Defendant's prior experience with the police must also be considered, for, if the defendant had been given his rights on numerous other occasions, he might have had sufficient understanding to waive his rights. The evidence presented revealed the defendant had had many encounters with the police as a juvenile, but there was no concrete evidence that he had been given his *Miranda* rights on those occasions. In addition, the encounters with the police were often short and were more supportive than frightening to the defendant. After many of his encounters with the police, they escorted him home.

Another consideration in reviewing the defendant's knowing and intelligent waiver of his rights is the defendant's testimony at the hearing. It was apparent from his attempt to read the rights form that he did not know many of the words and did not have a comprehensive understanding. The facts that the advice is repeated and that a defendant states he understands his rights do not assure an intelligent understanding unless he possesses the intelligence to understand the warning. (*People v. Long* (1991), 217 Ill. App. 3d 940, 578 N.E.2d 26.) Common sense tells us that there cannot be an intelligent understanding of *Miranda* warnings if the defendant cannot hear or if the warnings are read in English to a person who does not understand English. A subnormally intelligent person may be no different from a deaf person or a person who understands little English in intelligently understanding the *Miranda* warnings. Here, the trial court was justified in concluding that defendant was unable to understand his rights without simplification and explanation of the words contained in the *Miranda* warnings.

We now consider whether the defendant's statements to the police were voluntary. The voluntariness of a confession is determined from the totality of the circumstances (*People v. Thomas* (1990), 137 Ill. 2d 500, 561 N.E.2d 57), and a review of the voluntariness includes many of the same factors considered in determining whether the defendant knowingly and intelligently waived his rights, *i.e.*, his mental ability, his familiarity with the language, his age, his education and his experience. (*Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958.) We will not reiterate those factors considered in our foregoing discussion of the defendant's waiver of his rights; however, other factors not considered previously, but which contribute to the voluntariness of a confession, will be discussed.

■ One factor to consider is whether the defendant's confession was coerced. It has been held that coercion can be mental as well as physical. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) Here, the State has raised, as separate issues, that the court erred as a matter of law in holding that any statement made after an accused has learned he failed a polygraph examination is inadmissible, and that the court erred in finding that the defendant's statements were involuntary after being falsely informed that fingerprints found at the scene of the crime matched his. We find that the court considered the polygraph examination and the misrepresentation regarding the defendant's fingerprints as two factors, among others, which comprised mentally coercive tactics under the totality of the circumstances presented in this case. Thus, while the State is technically

correct that statements made after being informed of failing a polygraph examination are not automatically inadmissible (*Thomas*, 137 Ill. 2d 500, 561 N.E.2d 57), such a practice can be considered as a factor in the voluntariness of a confession. (See *People v. Sickley* (1983), 114 Ill. App. 3d 167, 448 N.E.2d 612.) This practice, combined with the defendant's mental capacity and his suggestibility, can become a coercive tactic designed to make the defendant confess and can undermine the voluntariness of the confession. It is interesting to note that the defendant did not make any inculpatory statements until after he had been told that the polygraph examination revealed he was not telling the truth.

Similarly, the misrepresentation by the police regarding the defendant's fingerprints being found at the scene of the crime was a mentally coercive tactic designed to obtain a confession from the defendant. While, standing alone, this deception might not be sufficient to vitiate the voluntariness of the defendant's confession, when considered with the other factors in this case (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228), the trial court's finding of lack of voluntariness of the defendant's confession is further supported.

The State lastly contends that the six instances of overreaching and police misconduct listed in the court's suppression order do not support the court's decision as these instances are irrelevant. Without going through these specific instances, suffice it to say that these instances were part of the totality of the circumstances. We find that these particular instances, with the exception of the court's consideration of the polygraph examination and the misrepresentation on the fingerprints, were not the basis of the court's decision, but they reinforced the court's conclusion. What is important is that the factors relied on by the court were relevant and proper, and the court's determination that the defendant's statements were not voluntary was not against the manifest weight of the evidence.

We recognize the seriousness and necessity of removing an arsonist and murderer from society as soon as possible. The police and some members of the public must feel at times that the courts have created some kind of game wherein the police lose if they do not strictly adhere to arbitrary rules. The protection of constitutional rights, however, is not being arbitrary. Further, the law and the rules as to confessions are designed to ensure that any confession obtained from a defendant is trustworthy. After all, society is not being served by the police obtaining a false confession from a subnormally intelligent suspect, while the real criminal remains free.

We are not requiring the police to be psychologists or to have a psychologist on call when the police are endeavoring to obtain a confession from a suspect. We are suggesting that whenever the police know that they have a subnormally intelligent suspect the police should take extra care to ensure that this person understands the *Miranda* warnings and that the alleged confession obtained is not simply a repetition of what the police desire to hear in order to solve the crime. See *People v. Giacomo* (1993), 239 Ill. App. 3d 247, (for an example of the care and caution that the police used in obtaining a valid confession of a subnormally intelligent defendant).

For the foregoing reasons, the judgment of the circuit court of Jackson County granting the defendant's motion to suppress is affirmed.

Affirmed.

CHAPMAN, P.J., and WELCH, J., concur.