# State of Vermont v. Bruce Ives

[648 A.2d 129]

No. 91-571

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed May 27, 1994

*M. Patricia Zimmerman*, Windsor County State's Attorney, White River Junction, for Plaintiff-Appellee.

*Charles Martin* and *Edward Wayland*, Law Clerk, of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Allen, C.J.** Defendant appeals his conviction for sexual assault, 13 V.S.A. § 3252(a)(1), alleging three errors. First, defendant contends that the trial court erred in holding that he was capable, notwithstanding his low IQ, of a knowing and intelligent waiver of his *Miranda* rights. Second, defendant argues that the trial court erred by denying his motions for an additional competency hearing, a psychological evaluation and a continuance. Finally, defendant alleges that the trial court improperly admitted hearsay evidence as excited utterances. We affirm.

On January 12, 1990, the victim was sexually assaulted and identified defendant, a person known to her, as her assailant. The victim identified defendant to her father over the telephone, to the examining physician at the hospital, to the trooper who met her at the hospital, and, finally, to the detective who also came to the emergency room. The victim later identified defendant in a photographic lineup. Defendant was arrested and taken into custody. After explaining the *Miranda* rights to defendant and obtaining a waiver, a detective interviewed him. During this interview, defendant did not confess to the assault but admitted being in the victim's store on the day of the assault.

Defendant moved to suppress his statements, arguing that he could not have knowingly and intelligently waived his *Miranda* rights because he exhibited difficulty understanding the *Miranda* warnings. This motion was denied. Subsequently, it was discovered that defendant had a full scale IQ of 72, indicating he is borderline to being

retarded. Defendant renewed his motion to suppress, and the trial court again denied the motion.

The trial court did, however, order a psychiatric evaluation and competency hearing, after which the court determined that defendant was competent to stand trial. Nearly five months later, on July 17, 1991, defense counsel moved for a continuance and a psychological evaluation of defendant's competence to stand trial. The court held a hearing on the motions the following day. Regarding the motion for a second competency evaluation, the court noted that Dr. Theodore Robbins, who performed the first competency evaluation, had examined defendant three days before on July 15. Dr. Robbins had communicated to the court that he still believed defendant was competent to stand trial, and the court agreed. The court denied both motions without taking evidence. Defendant was subsequently tried and convicted.

I.

■ Defendant moved twice, unsuccessfully, to suppress his statements to police, alleging that he had not knowingly and intelligently waived his rights to remain silent and to the assistance of counsel. Because he was given the required *Miranda* warnings before interrogation ensued, a valid waiver depends on two findings.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Defendant does not claim that police coerced him, "a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 169–70 (1986). Thus, our inquiry concerns only whether defendant's waiver was knowing and intelligent, which the State must prove by a preponderance of the evidence. *State v. Badger*, 141 Vt. 430, 439, 450 A.2d 336, 341 (1982).

■ In both motions, defendant contended that he did not understand his rights or the consequences of waiving them. To be consti-

tutional, a waiver must be made with a "requisite level of comprehension," such that an individual has "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. The trial court must consider the "totality of the circumstances" in determining whether the defendant understood the *Miranda* warnings. *Fare v. Michael C.*, 442 U.S. at 725. The factors relevant to this inquiry include defendant's "experience, education, background, intelligence or capacity to understand the warnings and the meaning of a waiver." *State v. Malinowski*, 148 Vt. 517, 522, 536 A.2d 921, 924 (1987).

■ This Court accords great deference to the trial court's findings under the totality of the circumstances approach. *Id.* at 520, 536 A.2d at 923. In making these findings, the trial court determines the weight and sufficiency of the evidence, including the credibility of the witnesses and the persuasive effect of their testimony. *State v. Wall*, 137 Vt. 482, 486, 408 A.2d 632, 635 (1979), *cert. denied*, 444 U.S. 1060 (1980). That determination stands "if supported by credible evidence, although there may be inconsistencies or even substantial evidence to the contrary." *Id.* The findings must stand unless they are clearly erroneous. *Malinowski*, 148 Vt. at 520, 536 A.2d at 923.

### A.

We turn first to the denial of defendant's initial motion to suppress. When that motion was heard, the evidence consisted of testimony by the interrogating officer, a signed copy of the *Miranda* warnings issued to defendant, and a transcript of the interrogation. Defendant did not testify at the hearing, or raise the issue of his level of intelligence. Defense counsel did cross-examine the interrogating officer, Detective Jeffrey Cable. Neither the interrogating police officer nor the court knew that defendant's IQ was borderline to retarded.

The interrogating officer testified that defendant acted as if he understood what was being said, that he did not appear to be under the influence of drugs, and that he understood English. Moreover, the transcript of the interrogation reveals that defendant was an adult and had graduated from high school. Based on this evidence, the court found that:

> defendant understood English; had no physical or mental disability affecting his ability to hear and understand Detective Cable; exhibited no signs of being under the influence of alcohol

or drugs; responded to questions coherently, logically and appropriately; detailed his activities the day prior to the interrogation to a degree where he described the clothing he was wearing at that time. He exhibited sufficient coherence of thought to adequately demonstrate a mental capacity to understand and intelligently waive his Miranda rights to remain silent and to the assistance of counsel.

In short, the court took evidence on factors deemed important to evaluating a waiver of *Miranda* rights. See *Malinowski*, 148 Vt. at 522, 536 A.2d at 924.

■ Defendant argues that the court never considered the totality of the circumstances, because it did not discover that defendant cannot read and write, and that he apparently had no previous experience with the police. In this vein, the dissent believes that the colloquy between the police officers and defendant should have raised sufficient doubt about his intelligence to compel the State to delve further into defendant's background prior to questioning. Having so concluded, the dissent goes on to fault the trial court for not undertaking the "cursory check" that would have revealed defendant's limitations. The trial court, however, expressly noted that

[a]lthough the State did not introduce any evidence as to the defendant's age, education or prior experience with law enforcement authorities, it did introduce by way of [the interrogating officer's] observations of the defendant and the verbatim transcript of the entire interrogation in question sufficient evidence going to the defendant's background, intelligence and general capacity to understand the waiver, to permit the Court to adequately evaluate this issue, especially in light of the fact that no issue has been raised casting doubt on the defendant's mental capacity or physical ability to understand the nature of the asserted waiver.

In ruling that the evidentiary record was sufficient to support a finding of waiver, the court did not relieve the State of its burden to prove that defendant's waiver was knowing and voluntary. How defendant had performed in the context of the interrogation was more important than his specific age, education, or IQ. The trial court weighed evidence provided by the State on each relevant factor in determining that defendant intelligently waived his *Miranda* rights.

■ In effect, defendant and the dissent would put the burden on interrogating police officers and the court to discover or diagnose

mental deficiencies not reasonably evident. Defendant answered "yes" to every question about understanding his rights, questions that were repeated when defendant hesitated in his initial responses. Police officers are not trained psychologists; as a general rule, it would not be desirable to have them interpret "yes" to mean "no."

With the benefit of perfect hindsight, the dissent argues that defendant answered ambivalently, and that this should have prompted an in-depth inquiry. But in the context of circumstances then known, the officers responded reasonably by repeating the questions to defendant to ensure he understood them. After defendant responded "yes" to each question concerning his rights, the officer again asked if he understood each right. Defendant answered, "Trying to, but yes." The officer acknowledged that defendant's uncertain answer indicated that defendant was having some trouble understanding. Under the circumstances, however, defendant's response did not necessarily evidence the lack of sufficient intelligence to understand the rights he waived. The officer then repeated the litany of rights and paraphrased the critical right to silence: "In other words, you don't have to talk to me now if you don't want to." He then asked if defendant understood and defendant said, "Yeah." This answer sufficed to dispel any doubts the officer may have had regarding defendant's capacity to understand his rights and the significance of their waiver. Finally, when the officer informed defendant that if he opted to answer questions he could stop at any time, defendant answered, "Yeah. I know I got a right to, I guess."

When the officer asked defendant if he wanted to talk, defendant volunteered that "I ain't got nothing to hide, so I can't see why not." This statement indicated that defendant understood that he was involved in an adversarial process and that if he had something to hide, he could protect himself by not speaking. Although the record does not show the full extent of defendant's capacity to fathom the intricacies of the legal system, it does show that defendant had the kind of concrete understanding of his rights necessary for an intelligent and voluntary waiver. See *State v. Cleary*, 161 Vt. 403, 411, 412, 641 A.2d 102, 107, 108 (1994) (person waiving right need not have thorough understanding of all potential legal consequences; nothing more required than a concrete understanding of meaning of right and effect of waiver).

The evidence before the court showed nothing in this colloquy that triggered suspicion that defendant had a borderline IQ. Rather,

defendant functioned adequately in the situation, answering questions appropriately. He did not simply answer "yes" to everything; he was able to express his need for help with some parts of the process. The dissent's general remarks about coerciveness of police interrogation and its effect on mentally retarded defendants are irrelevant in this case, because there was no evidence that defendant was coerced, and defendant makes no such claim on appeal. The trial court made a common-sense ruling based on a preponderance of credible evidence that defendant knowingly and intelligently waived his rights to remain silent and to the assistance of counsel. The law does not require more.

## B.

In July 1991, defendant renewed his motion to suppress his statements before a different judge, who presided at trial. This time, the court had before it evidence that defendant had a borderline IQ of 72.* The trial judge may have had the additional knowledge that defendant's intelligence was borderline retarded, but evidence of a low IQ, in itself, does not compel a finding that defendant was unable to understand his *Miranda* rights. See *Cleary*, 161 Vt. at 406-07, 641 A.2d at 105. Rather, suppression of evidence is warranted only if a defendant's impairment is shown to have interfered with the ability to exercise rights in the particular circumstances of the interrogation. *Id.*; cf. *In re Robinson*, 161 Vt. 550, 555, 641 A.2d 779, 782 (1994) (in assessing voluntariness of incriminating statement under Vermont Constitution, there must be proof of link between mental illness and making of statement). In making this assessment, the trial judge had the benefit of knowing not only defendant's IQ, but also the entirety of the expert's report. The focus of that report was defendant's mental competence to stand trial as well as his sanity at the time of committing the crime. It provided the court with additional context to evaluate defendant's ability to waive his rights.

In his report, the expert noted that defendant had borderline intelligence and a history of alcohol abuse. He added:

---

* Defendant's second motion to suppress never requested an evaluation of the earlier ruling in light of new evidence. Instead, defendant identified the motion as one required to preserve the waiver issue on appeal, because the trial judge was not the same judge who denied the first motion to suppress. See *State v. Senecal*, 145 Vt. 554, 558, 497 A.2d 349, 351 (1985). The trial judge denied the motion, stating he had "fully reviewed" the prior opinion.

Mr. Ives' school history is consistent with this level of intelligence. He says he went to school to the 12th grade but never learned to read. In spite of his limited intellect and alcohol abuse problem he has subsisted through odd jobs and at times has worked in a local wood working mill.

As to defendant's understanding of the legal system, the expert noted:

> When asked about the charges against him he was clear as to his innocence and the consequences of being found guilty. He understood who the various members of the court were and was clear as to how he should behave in court. He felt he could work with his attorney and was aware about his change of attorney caused by his attorney's conflict of interest. He was clear about the events of the day in which his alleged crime occurred and seemed able to work with his attorney.

The expert concluded:

> Mr. Ives is an individual with limited intellect who has a history of chronic alcohol abuse. He lives on his own with assistance in his financial transactions. He works part time doing chores for local farmers and has no history of violent or aggressive behavior. He is basically responsible for himself and understands legal and illegal behavior. He is clear about the court process and understands the charges against him. He is not sophisticated but knows the facts and understands the role of his defense attorney. He has shown no form of psychiatric orientational behavior other than alcohol abuse. Therefore, I conclude that Mr. Ives is competent to stand trial.

■ The expert's conclusions were uncontradicted except for defense counsel's repeated assertions that he had difficulty communicating with his client. On the second motion to suppress, the trial judge had more complete information about defendant's education, background, and intelligence. Nothing in the expert's report calls into question what the court had previously found—that defendant had the kind of concrete understanding of his rights sufficient to waive them. In summary, the trial court correctly determined that defendant knowingly and intelligently waived his rights to the assistance of counsel and to silence before police questioning ensued.

## II.

In November 1990, one month after the court decided the first motion to suppress, defendant was assigned a new attorney. Counsel raised the issue of defendant's intelligence level for the first time, in a motion for a psychiatric evaluation to determine whether he was competent to stand trial. The motion asserted that serious questions had arisen "with respect to defendant's ability to undei.stand the nature of the cause against him and his ability to assist in the preparation of his defense." An examination was ordered and a competency hearing held on February 20, 1991. In the hearing, the examining psychiatrist testified that despite a borderline IQ, defendant clearly understood right from wrong and the events that surrounded the alleged offense. The psychiatrist concluded that defendant was competent to stand trial. Defendant offered no evidence at the hearing and waived written findings. The court found defendant competent to stand trial.

After this hearing, the prosecution reported that it was ready for trial; the defense indicated that it would be ready in sixty days. The case was set for trial for the week of June 24, 1991, but was rescheduled for the week of July 22, 1991 at the request of defendant's counsel because of a trial conflict. At a status conference held on July 12, defense counsel indicated that he had had difficulties communicating with his client. The court ordered the psychiatrist who had earlier examined defendant to reevaluate him and advise the court immediately of the results of the examination. Again, the psychiatrist opined that defendant was competent to stand trial. On July 17, the defense moved for a continuance and a psychological evaluation. Defense counsel persisted in maintaining that defendant was incompetent, and alleged that additional time was needed to permit the psychological testing and to accommodate defense counsel's extremely busy trial schedule, which had prevented him from preparing for trial. The court denied defendant's motion for psychological testing at a hearing on July 18.

Defendant first argues that the court erred in denying his motion for a second evaluation without a proper evidentiary hearing. The statute governing the determination of competency provides:

> If a person . . . at any time before final judgment, raises before the court . . . the issue of whether such person is incompetent to stand trial . . . a hearing shall be held before such court at which evidence shall be received and a finding made

regarding his competency to stand trial. However, in cases where the court has reason to believe that such person may be incompetent to stand trial due to a mental disease or mental defect, such hearing shall not be held until an examination has been made and a report submitted by an examining psychiatrist . . . .

13 V.S.A. § 4817(b). The court considered defendant's motion for a second competency determination at a hearing the following day. At that hearing, defendant's attorney only reiterated his belief that questions remained about his client's ability to deal with matters at trial. No new evidence was presented on the issue of competence, but the court did have information that Dr. Robbins had affirmed his opinion that defendant was competent, having examined him three days before. Based on this updated evaluation and the results of the first competency hearing, the court again found that defendant was competent to stand trial, and denied the motion for an additional evaluation and competency hearing.

Defendant requested psychological testing, but the statute requires only that psychiatric testing be provided in certain circumstances. See *id.* § 4817(b). Convinced that defendant was competent to stand trial, the court was not obligated to order further evaluation. See *State v. Welch*, 159 Vt. 272, 276–77, 617 A.2d 427, 430–31 (1992) (trial court may use its discretion on basis of evidence before it in determining whether defendant is incompetent and thus entitled to a psychiatric evaluation). In light of the psychiatrist's continued finding of competence, and defense counsel's failure to offer any contradictory evidence, the trial court reasonably could have denied the motion for the psychological evaluation. The court did not abuse its discretion, and hence there was no error.

Similarly, we see no reason to disturb the denial of a continuance. This is a matter within the trial court's discretion, "[s]o long as such a decision is not based on improper or illegal considerations." *State v. Perry*, 131 Vt. 337, 341–42, 306 A.2d 110, 113 (1973). The trial court could have denied the motion for a continuance on the ground that it was not supported by an affidavit. V.R.Cr.P. 50(c); cf. *State v. Carter*, 154 Vt. 646, 646–47, 577 A.2d 280, 281 (1990) (mem.) (defendant's failure to submit accompanying affidavit with motion to disqualify assistant judge was grounds for denial under V.R.Cr.P. 50(d)). Instead, the court heard defense counsel's reasons for the

requested continuance and concluded that they did not warrant granting the motion.

The attorney had been assigned to represent defendant early in November of 1990. At the time of his assignment, all discovery and investigation had been completed by prior counsel. Defense counsel had indicated to the court in February of 1991 that he would be ready for trial in sixty days. The earlier continuance was granted to accommodate a trial conflict, not a lack of preparedness. No indication of such a problem surfaced at the status conferences held prior to trial. By the time of the hearing on the motion to continue, counsel had abandoned any notion of raising a diminished capacity or insanity defense in favor of a theory of mistaken identity. Counsel for the defense, however, based his request for a continuance partly on the grounds of needing time to conduct psychological testing, and it was unclear to the trial court as to how this testing would assist in a mistaken-identity defense. In any event, counsel had ample time to conduct such testing even without a continuance. Defendant received a vigorous and competent defense, and does not suggest on appeal how he was prejudiced by the denial of the motion to continue. We find no abuse of discretion in denial of the motion to continue.

## III.

Defendant's final claim of error concerns the admission of statements that the victim made to her father. These statements, which identified defendant as her assailant and described the assault, were treated as excited utterances, an exception to the rule excluding hearsay. See V.R.E. 802. Defendant believes that the State failed to establish that the victim's statements to her father were spontaneous or instinctive, or that they were uttered sufficiently close in time to the startling event.

Rulings regarding the admissibility of evidence are subject to review only for an abuse of discretion. See V.R.E. 104(a); *State v. Ayers*, 148 Vt. 421, 424, 535 A.2d 330, 332 (1987). Thus, we will uphold the trial court's determination that the statements in question qualify as excited utterances if the decision has a reasonable basis. See *State v. Goodrich*, 151 Vt. 367, 375, 564 A.2d 1346, 1351 (1989). Rule 803(2) defines excited utterances as statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." V.R.E. 803(2). The statement need not be contemporaneous with the exciting event; "the

key consideration is the condition of the declarant." *State v. Shaw*, 149 Vt. 275, 281, 542 A.2d 1106, 1109 (1987) (statement made two to three hours after sexual assault held admissible as excited utterance where it was clear from testimony that declarant was under the stress of the sexual assault).

In this case, the State offered evidence that the father thought the victim was speaking of something that had happened quite recently, that he could tell from his daughter's voice that she was upset, and that she had called her father soon after the assault. Based on this and other credible evidence, the trial court found that the victim was under the stress of a startling event, that the event had occurred very recently, that her voice was excited, and that her statements were not a product of reflection. These findings are supported by the testimony, and provided a reasonable basis to admit the victim's statements as excited utterances. The trial court did not abuse its discretion in admitting the hearsay evidence.

*Affirmed.*

**Dooley, J.**, concurring and dissenting. I agree with Parts II and III of the majority opinion and concur in the holdings therein. I agree with Justice Johnson, however, that the second, and controlling, decision on the motion to suppress was inadequate, because the court failed to consider the new evidence about defendant's mental capacity and his ability to read. See *State v. Bruno*, 157 Vt. 6, 10, 595 A.2d 272, 274–75 (1991) (when defendant makes pretrial motion to suppress and renews motion before second judge, ruling on renewed motion is controlling for purpose of appeal).

I would not, however, go as far as to hold that no waiver of *Miranda* rights occurred as a matter of law. Thus, the remedy initially must be a "context-specific inquiry into the nature of defendant's cognitive limitations and their effect on his understanding of his rights, the language used by the interrogating officer, and the concept of waiver." *State v. Ives*, 162 Vt. 131, 149, 648 A.2d 129, 140 (Johnson, J., dissenting). Whether the defendant should receive a new trial should depend on the outcome of this inquiry. See *State v. Shaw*, 149 Vt. 275, 284, 542 A.2d 1106, 1111 (1987) (remanding sexual assault and felony trespass to trial court with direction to order new trial if court concluded that complainant's prior statements improperly suppressed at trial "probably would have changed the outcome of the case," but if not, or if suppression error was harmless beyond reasonable doubt, to reinstate defendant's convictions).

**Johnson, J.,** dissenting. I respectfully dissent. I cannot join in upholding the district court's conclusion that a mentally retarded individual with a developmental age of seven and one-half years knowingly and intelligently waived his rights to silence and to counsel, solely on the basis of the fact that he listened to a repetitive four-minute recitation of his rights by a police interrogator. Nor can I join in upholding the court's limited inquiry into defendant's competence to stand trial.

I dissent because, as in *State v. Lockwood,* the majority fails to consider the unique needs of persons with mental retardation in the context of a criminal investigation and prosecution.[1] Specifically, the majority upholds a conviction in which inculpatory statements taken from a mentally retarded defendant were admitted into evidence with virtually no inquiry into defendant's mental history or cognitive abilities, and with no attempt to determine whether his limited mental abilities prevented him from making a knowing waiver of his constitutional rights. Further, the focus of the competence decision in this case was on defendant's sanity at the time of the offense, rather than on whether defendant's mental disability prevented him from participating effectively in his defense at trial, and the court failed to hold a renewed competence hearing, despite being informed by defense counsel that he had difficulty communicating with defendant and that defendant appeared to be unable to make decisions concerning his defense.

## I.

The majority provides few facts regarding defendant's background, education, experience, or cognitive abilities, which are critical to an understanding of this case. Defendant, who was thirty-two years old at the time of the assault, was diagnosed as having "speech" problems in his first year of school. He attended special education classes throughout elementary and high school. Although he graduated from Randolph Vocational Center, he never learned to read or write. After his graduation, he worked at numerous jobs involving simple physical tasks such as loading trucks and piling lumber. He was unable to keep

---

[1] In *State v. Lockwood,* 160 Vt. 547, 632 A.2d 655 (1993) (Johnson, J., dissenting), I dissented from the majority's holding that a finding of competence to stand trial made two years earlier was sufficient to show that a mentally retarded defendant was competent to plead guilty, enter into a probation warrant with restrictive conditions, and participate in a probation revocation hearing resulting from alleged violations of conditions of release.

any of these jobs, and since 1987 he has earned income by doing basic chores for neighbors and, later, by collecting disability payments, to which he is entitled because of his limited intellect. His siblings have always handled his financial affairs.

Defendant is a chronic alcoholic, and his IQ scores indicate that he is a person with borderline or mild mental retardation.[2] In response to his application for social security disability benefits, he was found to have a full-scale IQ of 72 and a verbal score of 69. He was also tested as part of the preparation of the presentence investigation. Based on a nonverbal intelligence test that measured "language-free" intellectual functioning, he was found to have an IQ of 70, placing him in the bottom 2% of the population. Based on selected subtests of the Wechsler Intelligence Scale, which measures vocabulary, comprehension, and ability to process information, he scored a 65, which placed him in the bottom 1% of the population. His developmental age score was measured at seven years, six months. The PSI assessment concluded, in part, that defendant's limited intellectual functioning made him a risk to reoffend because he has "a diminished ability to accurately predict the consequences of his behavior or to utilize practical judgment or common sense."

## II.

### A.

The uncontradicted facts found by the district court in denying the initial motion to suppress filed in May 1990 are as follows. The morning after the assault, January 13, 1990, Detective Jeffrey Cable of the Vermont State Police, accompanied by four other police officers, arrived at defendant's apartment and informed him that he was under

---

[2] Mental retardation is defined as a fundamental difficulty in learning and performing certain daily life skills because of limitations in conceptual capabilities and practical and social intelligence. American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Support* 5 (9th ed. 1992). It is characterized by "significantly subaverage intellectual functioning," which is defined as an IQ standard score of "approximately 70 to 75 or below," with a 3-to-5-point deviation. *Id.* at 5, 37. The existence of intellectual limitations of this degree is "a necessary but not sufficient" condition of mental retardation. *Id.* at 14. Mental retardation occurs only when the intellectual limitations have an impact on coping or adaptive skills. *Id.* at 14–15. "Mildly" retarded persons generally have IQ scores ranging from 55 to 70, with a measurement error of approximately five points depending on the test. Note, *Constitutional Protection of Confessions Made by Mentally Retarded Defendants*, 14 Am. J.L. & Med. 431, 440–41 & n.80 (1989); Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 422–23 (1985).

arrest and that they had a warrant to search his apartment. Defendant was dressed in a shirt, long johns, and socks. When he moved toward his bedroom to put on some clothes, the officers subdued and handcuffed him after a brief struggle. Although Detective Cable conceded at the suppression hearing that he could have allowed defendant to put on some additional clothing, he did not feel that it was "appropriate" at the time. Still clad only in his long underwear, defendant was transported to the Bethel State Police Barracks, where he was placed in a small, windowless interrogation room for approximately an hour and ten minutes until Detective Cable returned to interrogate him.

During a colloquy that lasted less than four minutes, detective Cable obtained defendant's waiver of his *Miranda* rights. The officer read each right individually and then asked defendant if he understood. Defendant responded with a single word—yes—when asked whether he understood his right to remain silent and to speak to a lawyer, and whether he understood that anything he said could be used against him in a court of law. The officer then stated: "If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning, if you wish. In Vermont, that is called a Public Defender. Do you understand?" Defendant replied, "I can't afford a lawyer." The officer then repeated the statement verbatim, and defendant replied, "Yes."

When asked if he understood each of the rights explained to him, defendant replied, "Trying to, but yes." The officer then repeated the rights using similar language and concluded by saying, "In other words, you don't have to talk to me now if you don't want to. Do you understand that?" Defendant answered, "Yeah." Detective Cable then asked again if defendant understood his rights, but when defendant attempted to answer beyond a simple yes, the officer interrupted him and asked him whether he understood that if he decided to answer questions at that time he could stop at any later time. Defendant's response to that question was, "Yeah, I know I gotta right to, I guess." When asked if he wanted to talk, having all those rights in mind, defendant responded, "I ain't got nothing to hide, so I can't see why not. I ain't got nothing to hide because [inaudible] would have told me. I dunno anythin' about it." At this point, the officer gave a brief explanation of the written waiver form before asking defendant if he understood it. Defendant's answer was inaudible. Defendant then answered questions. The answers revealed he was at the scene of the crime with the victim on the day in question, although he maintained his innocence of the crime.

## B.

Defendant's qualified and limited responses did not provide sufficient evidence to support the district court's conclusion that the State met its "heavy burden" of showing a knowing and intelligent waiver. See *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("courts must presume that a defendant did not waive his rights"; even express statement of waiver is not necessarily sufficient to establish waiver of constitutional rights); *Miranda v. Arizona*, 384 U.S. 436, 475 (1966) ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."); *State v. Austin*, 155 Vt. 531, 534, 586 A.2d 545, 546 (1990) ("The State bears a heavy burden in demonstrating a knowing and intelligent waiver of *Miranda* rights."). Of the dozen responses given by defendant when his rights were read to him, all but four were a simple "yes." Three of the other four responses indicated that defendant did not know what the officer was telling him, and part of the fourth response was inaudible.

Surely, this colloquy between defendant and the interrogating officer raised sufficient doubt, even assuming the court was unaware of defendant's limited intelligence, to require the court to make a further inquiry into defendant's background and intelligence. We require the district court to consider relevant factors such as a defendant's age, experience, education, background, intelligence, and capacity to understand the waiver, unless the evidence leaves no doubt that the defendant understood the nature of the waived constitutional rights and the consequences of waiving those rights. *State v. Malinowski*, 148 Vt. 517, 519–20, 536 A.2d 921, 923 (1987) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979), for proposition that totality-of-circumstances approach "mandates" inquiry into factors such as experience, background, intelligence, and capacity to understand); see *State v. Olson*, 153 Vt. 226, 232, 571 A.2d 619, 623 (1989) (no specific showing into *Fare* factors was required where defendant's understanding of waiver was neither vague nor questionable and trial court made "very specific findings" on defendant's physical and mental condition at time she received warnings). Indeed, when doubt is raised about the defendant's capacity to understand the waiver, it is "especially important" to inquire into all the relevant circumstances, including defendant's background and intelligence. *State v. Austin*, 155 Vt. at 534, 586 A.2d at 546.

With the following statement, the district court explained its primary rationale for finding a knowing and intelligent waiver:[3]

> Although the State did not introduce any evidence as to the defendant's age, education or prior experience with law enforcement authorities, it did introduce by way of Detective Cable's observations of the defendant and the verbatim transcript of the entire interrogation in question sufficient evidence going to the defendant's background, intelligence and general capacity to understand the waiver, to permit the Court to adequately evaluate this issue, especially in light of the fact that no issue has been raised casting doubt on the defendant's mental capacity or physical ability to understand the nature of the asserted waiver.

The essence of this statement is that the transcript of the interrogation demonstrated a knowing waiver so clearly that the State did not need to present further evidence regarding defendant's background, education, intelligence, experience, or capacity to understand the waiver. I strongly disagree with the court's conclusion. Defendant's responses were equivocal and uninformative. Given the State's heavy burden, the court should have considered more than defendant's limited responses and the officer's testimony that defendant "appeared to" understand his rights. See *Cooper v. Griffin*, 455 F.2d 1142, 1145 (5th Cir. 1972) (instead of rebutting expert testimony regarding defendants' mental capabilities, State merely offered testimony of interrogating officer that defendants "'appeared to'" understand *Miranda* warnings). Rather, the court should have made a further inquiry into defendant's background and intelligence. Even a cursory check into his past would have revealed that he had attended only special education classes, was illiterate, had a subnormal intellect, and had virtually no prior experience with the law.

Absent a further showing by the State indicating that defendant made a knowing and intelligent waiver, I believe the court should have

---

[3] The district court concluded that because the State did not introduce evidence that defendant was literate, and the transcript did not establish that defendant was adequately advised orally as to what his signature on the written waiver form meant, the written form could not be relied on to show a knowing and intelligent waiver. Given this fact, and the fact that the transcript indicates defendant did not understand that he had a right to counsel at state expense, defendant did not waive his right to counsel under the Public Defender Act, and his statements should have been suppressed on that ground. See *State v. Caron*, 155 Vt. 492, 511–12, 586 A.2d 1127, 1138–39 (1990) (13 V.S.A. § 5237 requires that waiver of right of needy person to be represented by counsel at public expense must be made by defendant in writing).

suppressed defendant's statements. The majority disagrees, stating that (1) how defendant performed during the interrogation was more important than his educational background or his IQ, and (2) my position would place the burden on police to diagnose mental deficiencies, which they are not trained to do. I do not understand the relevance of either point. First, I see little significance in debating the relative importance of the various factors to be considered by the district court. My position is that the evidence did not demonstrate a knowing and intelligent waiver so clearly that the court could forego consideration of additional relevant factors, such as defendant's background and intelligence, that were not apparent from merely reading the transcript of the interrogation or hearing testimony from the interrogating officers. As I stated above, I believe further inquiry was required here. As for the majority's second point, an incriminating statement that results from an unknowing waiver is not admissible merely because the police were unaware that the defendant was incapable of making a knowing waiver. The courts must determine whether particular defendants knowingly and intelligently waived their constitutional rights, not whether the police were able to tell if the defendants had the capacity to waive those rights.

### C.

Eight months after the first motion was denied, defendant filed a renewed motion to suppress. Despite the fact that new evidence regarding defendant's limited mental capacity had come to light, a different judge denied the motion without a hearing, stating only that he agreed with the soundness of the first judge's decision. This, too, was error, for the second judge relied solely on the soundness of an opinion that was based, to a large extent, on the absence of evidence showing that defendant did not have the mental capacity to understand the rights he was waiving, precisely the subject of the new evidence. The end result is that there was no hearing in which the court made a context-specific inquiry into the nature of defendant's cognitive limitations and their effect on his understanding of his rights, the language used by the interrogating officer, and the concept of waiver.[4]

---

[4] The court had already found defendant competent to stand trial, but such a finding does not necessarily indicate that defendant had the ability to knowingly and intelligently waive his constitutional rights. Cf. *Godinez v. Moran*, — U.S. —, —, 113 S. Ct. 2680, 2687 (1993) (finding that defendant is competent to stand trial "is not all

The majority's principal reason for approving the second judge's refusal to hold a hearing on defendant's renewed motion to suppress is that evidence of a low IQ, by itself, does not compel a finding that defendant was unable to understand his rights. According to the majority, the suppression of defendant's statements would be warranted only if his mental impairment is shown to have interfered with his ability to exercise his rights in the particular circumstances of the interrogation.[5] Before addressing the majority's general proposition that a low IQ does not compel a finding that a defendant is unable to make a knowing and intelligent waiver of rights, I emphasize that neither the first nor the second judge in this case ever addressed whether defendant's retardation interfered with his ability to understand his rights or to make a knowing and intelligent waiver of those rights. Indeed, the court's failure to make this inquiry goes to the very heart of my dissent.

The majority attempts to gloss over this fact by pointing out that the second judge had the benefit of a psychiatrist's report. The availability of the report cannot make up for the judge's failure to consider whether defendant's retardation prevented him from knowingly and intelligently waiving his rights. First, there is no indication that the second judge considered the report in denying defendant's renewed motion to suppress. Indeed, without holding a hearing or making findings, the second judge explicitly stated that he was denying the motion because he agreed with the soundness of the first judge's decision; yet, the first judge was unaware of defendant's mental limitations and thus never considered them.

Second, even assuming the court examined the report, the majority acknowledges that the report attempted to address only defendant's competence to stand trial and his sanity at the time of the offense; it made no context-specific inquiry into whether, or how, defendant's limited intellect affected his ability to make particular judgments

---

that is necessary before he may be permitted to plead guilty or waive his right to counsel").

[5] One of the cases cited by the majority in support of this proposition is *In re Robinson*, 161 Vt. 550, 555, 641 A.2d 779, 782 (1994), where we held that a schizophrenic defendant's unresponsive utterance was admissible because there was no showing that the utterance was involuntary as a result of his illness. *Robinson* is inapposite because it involved a defendant who suffered from an episodic mental illness rather than a limited intellect. See *State v. Lockwood*, 160 Vt. at 569, 632 A.2d at 668 (Johnson, J., dissenting) (distinguishing between mental illness and mental retardation). In *Robinson* it was unclear to what extent defendant was affected by his illness at the time he uttered the statement, but here we know that Bruce Ives' was mentally retarded at the time he was interrogated.

regarding the waiver of his constitutional rights. Cf. *Godinez v. Moran*, — U.S —, —, 113 S. Ct. 2680, 2687 (1993) (finding of competence to stand trial does not necessarily permit defendant to plead guilty or waive counsel; because trial court must satisfy itself that waiver of constitutional rights is knowing and intelligent, there is "heightened" standard for waiving those rights).

As I stated in my *Lockwood* dissent, I believe that the interests of mentally retarded defendants can be protected only by conducting an individualized and contextualized inquiry into a defendant's ability to make particular decisions or types of decisions. 160 Vt. 547, 570, 632 A.2d 655, 669 (1993) (Johnson, J., dissenting). The district court could not have determined whether defendant was able to comprehend the significance of waiving his rights to silence and counsel based solely on an assessment of whether defendant could be held accountable for a crime or whether he could communicate effectively with an attorney at trial. Not only was defendant's waiver separated in time from the commission of the crime and from his trial, but it involved a different context-specific inquiry. Surely, the mere availability of a report that fails to address the relevant questions directly cannot serve as an adequate substitute for a hearing that would have allowed the court to explore those questions in making a context-specific determination.

I now return to the majority's point that a low IQ does not require a finding of an unknowing waiver. Although most jurisdictions have held that a person's subnormal intelligence does not, by itself, establish that the person is automatically incapable of making a knowing waiver of constitutional rights, courts do consider limited mental ability to be an important factor that warrants a close examination of whether mentally retarded suspects fully understood the significance of the waiver. See American Bar Association, Standards for Criminal Justice, Mental Health Standard 7-2.5, at 43 n.13 (2d ed. 1986) [hereinafter ABA Mental Health Standard] (citing cases standing for proposition that mental disability "is a significant element in determining the validity of a waiver of rights under *Miranda*"); see also *Smith v. Kemp*, 664 F. Supp. 500, 504–05 (M.D. Ga. 1987) (confession improperly admitted where evidence failed to show that defendant with IQ of 65 knowingly and intelligently waived his rights; state court merely noted defendant's retardation without addressing the impact of that fact on issue of whether waiver was valid), *aff'd*, *Smith v. Zant*, 887 F.2d 1407 (11th Cir. 1989); *Commonwealth v. Daniels*, 321 N.E.2d 822, 826–28 (Mass. 1975) (in cases involving adults with subnormal mental capacity, special care must be

taken to scrutinize record because circumstances and techniques of custodial interrogation that pass constitutional muster with persons of normal intelligence may not be constitutionally tolerable when applied to persons of limited intelligence); *State v. Cumber*, 387 N.W.2d 291, 294 (Wis. Ct. App. 1986) (subnormal intelligence of nineteen-year-old defendant was important factor in affirming suppression of inculpatory statement).

Accordingly, once the district court became aware of defendant's limited mental capacity, further inquiry was required into whether his waiver was knowing and intelligent. See *State v. Bushey*, 453 A.2d 1265, 1266–68 (N.H. 1982) (trial court's admission of inculpatory statement reversed where interrogating officer failed to explain concept of waiver to ensure that defendant with performance IQ of 66 and verbal IQ of 70 understood consequences of waiver). Absent additional indications of a valid waiver, the court should not have admitted defendant's incriminating statements based only on the fact that his rights were repeatedly read or that he briefly affirmed his understanding of those rights. See *People v. Higgins*, 607 N.E.2d 337, 344 (Ill. App. Ct. 1993) (fact that rights were read repeatedly does not assure an intelligent understanding of those rights absent showing that defendant possessed intelligence to understand them); *Commonwealth v. Daniels*, 321 N.E.2d at 827 (simple assertions of "yes" by mentally retarded adult did not establish that he comprehended waiver of *Miranda* rights); see generally Annotation, *Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession*, 8 A.L.R.4th 16, 33–35, 40–52 (1981) (citing federal and state cases involving waiver of *Miranda* rights by mentally retarded persons).

Such careful scrutiny of waivers made by mentally retarded defendants enhances the truth-seeking function of the judiciary. As I discussed in some detail in my *Lockwood* dissent, persons with mental retardation tend to possess certain characteristics that make them particularly vulnerable to police interrogation tactics and that create doubt about the reliability of statements or confessions extracted during interrogations.[6] See *Lockwood*, 160 Vt. at 569–70, 632 A.2d at 668–69 (Johnson, J., dissenting). Generally, mentally retarded individuals have difficulty expressing thoughts and analyzing information

---

[6] I repeat the caveat I stated in *Lockwood*, 160 Vt. at 569 n.9, 632 A.2d at 668 n.9, that persons with mental retardation are susceptible to being regarded in stereotypical terms. Nevertheless, "some characteristics occur with such frequency as to warrant certain limited generalizations." *Id.* (quoting Ellis & Luckasson, *supra*, at 427).

received from others. Ellis & Luckasson, *supra,* at 428–29. This difficulty results, at least in part, from limitations in their attention span and memory, and from their inability to understand abstract concepts or to be selective in analyzing information they receive. *Id.* Further, their self-awareness of these limitations in a society in which they are frequently shunned, coupled with their immature or incomplete concept of causation and blameworthiness, causes them to mask their handicap by indicating understanding of events or concepts when they have none or to seek approval by answering "yes" or even by confessing to a crime they did not commit. See *id.* at 428–31.

These tendencies make mentally retarded suspects extremely vulnerable to interrogation tactics aimed at obtaining a confession. On the other hand, for their part, the police are trained to use tactics during interrogation that will break down a suspect's defenses by working on individual weaknesses. See *Miranda,* 384 U.S. at 448–55. Interrogators are instructed to posit guilt as a fact, to minimize the moral seriousness of the offense, to cast blame on society in general, and to alternate between befriending and cajoling the suspect, in order to obtain a confession. *Id.*

Given the fact that police use such tactics, we should at least insist that a knowing waiver cannot be presumed absent a showing that the accused understood the concept of waiver and the principal legal implications of confessing or providing statements to the police. I believe such a showing would be very difficult to make unless counsel or another competent adult acting in the suspect's interest was present at the time the suspect waived *Miranda* rights and agreed to provide a statement.[7] See *State v. Flower,* 539 A.2d 1284, 1286–88 (N.J. Super. Ct. Law Div. 1987) (in suppressing confession made by defendant with IQ under 70 and mental age between 7 and 12, court rejected testimony of State's expert that any person with a mental age of 7-year-old child could understand *Miranda* warnings, and accepted testimony of defendant's expert that retarded defendant did

---

[7] Ellis and Luckasson point out that most mentally retarded persons will not understand one or more of the abstract concepts that underlie the *Miranda* warnings. See Ellis & Luckasson, *supra,* at 448. According to the authors:

> The concepts of what "rights" are, what it means to give them up voluntarily, the notion of the ability to refuse to answer questions asked by a person of great authority, the concepts of the subsequent use of incriminating statements, the right to counsel and the right to have the state pay for that counsel, and the idea that the suspect can delay answering questions until a lawyer arrives are all of some abstraction and difficulty.

*Id.*

not have mental capacity to understand abstract right contained in *Miranda* warnings), *aff'd*, 539 A.2d 1233 (N.J. Super. App. Div. 1988); cf. *Henry v. Dees*, 658 F.2d 406, 411 (5th Cir. 1981) (where defendants with limited mental ability are interrogated, police must painstakingly determine that they understood any waiver of rights, and counsel should be provided "absent an unmistakable, knowing waiver of that assistance").

This Court has already held that the Vermont Constitution does not permit juvenile suspects, in the context of a custodial interrogation, to waive the privilege against self-incrimination or the right to counsel until they have consulted with an adult interested in their welfare, such as a parent, attorney or guardian. *In re E.T.C.*, 141 Vt. 375, 379, 449 A.2d 937, 940 (1982). Our rationale for this holding was that minors hold a protected status in our society, which has recognized that juveniles often lack the capacity and responsibility to realize the full consequences of their actions. *Id.* at 378–79, 449 A.2d at 939. Much the same can be said for persons with mental retardation. See *State v. Flower*, 539 A.2d at 1287 (because persons with diminished mental capacity hold a protected status in our society, court must determine that informing them of constitutional rights is more than mere perfunctory procedure).

Accordingly, in cases where a suspect with subnormal intelligence has provided police with a statement during custodial interrogation, I believe the court must make a detailed context-specific inquiry into the suspect's cognitive abilities and, particularly, the effect of any mental limitations on the suspect's understanding of the rights involved, the language used to explain the rights, the concept of waiver, and the immediate and ultimate consequences of a waiver of those rights. *State v. Cleary*, 161 Vt. 403, 415, 641 A.2d 102, 109 (1994) (Johnson, J., dissenting). The absence of counsel, or an interested adult acting in defendant's behalf, should be considered a critical factor in the decision as to whether the waiver was, indeed, knowing and intelligent. Because the district court did not make such an inquiry, I would suppress defendant's statements and reverse the conviction.

## III.

I also disagree with the majority's conclusion that the court did not abuse its discretion by refusing to hold a second competence hearing after defense counsel reported difficulty in communicating with defendant. The grounds for my dissent on this point are twofold.

First, the initial competence hearing was inadequate because both the court and the court-appointed psychiatrist focused on sanity rather than competence. There was no in-depth examination of whether defendant possessed the skills necessary to allow him to communicate with counsel effectively and to aid counsel in preparing a defense. Second, even if the first competence hearing had been adequate, defense counsel's inability to communicate with a passive defendant should have triggered a new competence hearing, not merely a follow-up oral report from the same court-appointed psychiatrist.

## A.

A fuller examination of the facts than that provided by the majority is necessary to show the extent to which defendant was denied due process. As the majority stated, a competence hearing was held in February 1991, at the request of the newly-appointed defense counsel, who was aware of medical records revealing defendant's limited mental abilities. Before the hearing, the court-appointed psychiatrist, Dr. Theodore Robbins, examined defendant on one occasion for approximately two hours and wrote a two-and-one-half-page report concluding that defendant was sane at the time of the crime and was competent to stand trial. No tests were administered; rather, Dr. Robbins relied on IQ tests that had previously been given to defendant.

In the report, Dr. Robbins noted that (1) defendant was a "poor historian as far as dates" but was clear regarding his actions the day of the crime; (2) his borderline intellect did not prevent him from understanding the difference between right and wrong; (3) his thinking appeared normal with no signs of delusions; (4) he showed "low intellect" but was able to calculate change; (5) his memory "was poor but he showed reasonable short and long term memory"; (6) he was clear regarding the charges against him and the consequences of being found guilty; (7) he understood who the various members of the court were and he felt he could work with his attorney; and (8) though not sophisticated, he understood the role of the defense attorney. Based on these observations, contained in three paragraphs, Dr. Robbins concluded defendant was sane at the time of the crime and was competent to stand trial.

The competence hearing was very short, and almost all of Dr. Robbins' testimony concerned the effect of defendant's alcohol problem on his sanity or competence. The following is the entire testimony concerning whether defendant's limited mental ability affected his competence to stand trial:

PROSECUTOR: Okay. Was there anything during your examination of Mr. Ives which led you to question his sanity or his ability to understand these proceedings and his part in them?

A. Mr. Ives has a borderline level I.Q. which puts him above mental retardation but is considered borderline. But I felt that Mr. Ives could clearly understand right from wrong and be able to understand the events that surrounded . . . the alleged offense.

Q: Did he speak to you of the details of the offense?

A: Yes.[8]

Q: And, in doing so, did you have information from the Court as to the details of the offense as well?

A: I had police reports.

Q: Based on what Mr. Ives told you about the offense and your reading of the police reports, did you have any cause to think that Mr. Ives did not understand at least what was set forth in the police reports?

A: I had none.

Q: Did Mr. Ives have an appreciation for the role of his defense attorney?

A: He did.

Q: And did he have an appreciation for the role of the Court in the process?

A: He did.

Q: Did he understand the reason why his other attorney conflicted out of the case?

A: He did.

Q: Did he understand who the Judge was and the Judge's function in relation to this case?

A: Yes.

Q: Did you have any reason to believe that Mr. Ives did not understand the legal process?

A: No.

Q: Did you have any reason to believe that he did not understand the charges and the consequences of those charges?

A: No.

Q: Were you able to form an opinion as to whether or not Mr. Ives was competent?

---

[8] The questioning implies that defendant admitted the offense in discussion with the psychiatrist. Defendant has not admitted the offense and has continued to maintain his innocence after conviction.

A: I did.

Q: And what is that opinion?

A: I felt that Mr. Ives was competent to stand trial.

There was no cross-examination by defense counsel regarding defendant's mental limitations and their effect on his competence to stand trial. Based on Dr. Robbins' report and testimony, the court concluded that "it seems clear that the defendant is competent to stand trial."

Over five months later, at a status conference on July 12, 1991, defense counsel expressed renewed concerns that defendant was incompetent to stand trial. As a result of the conference, the court ordered Dr. Robbins to examine defendant again and report back to the court as soon as possible. Dr. Robbins examined defendant on July 15. Apparently, he made no report other than responding to a telephone call by a court employee on July 16, at which time he stated that defendant was still competent to stand trial.

On July 17, defense counsel filed a motion for a continuance to allow time to have a full range of psychological testing performed on defendant. In the motion, defense counsel stated that defendant did not appear to comprehend instructions and advice from counsel fully; that he deferred to third parties to make decisions, including whether to testify; and that he did not appear to have the intelligence or memory to follow testimony at trial or to be cross-examined. Noting that prior tests indicated defendant had particularly weak verbal and memory skills, the defense attorney questioned Dr. Robbins' prior conclusion that defendant was competent to stand trial, stating that he felt putting defendant through a trial would be "leading a lamb to slaughter."

The following day, defense counsel reiterated his concerns at a hearing on his motion to continue. The court acknowledged that its own concern over defendant's competence had led to its request for another psychiatric examination. Nevertheless, after stating that Dr. Robbins generally does not hesitate to say so when he thinks there is incompetence, the court informed counsel that the doctor had again determined that defendant was competent. According to the court, Dr. Robbins had informed a court employee by telephone that "there was a continuing competence to stand trial, even though there [are] the deficits, the cognitive ones we have already talked about, and there is some confusion." The court continued, "As far as that intellectual debt, he is not going to get dealt any more cards in his lifetime and I don't know what could be done to improve it." While acknowledging that it would be difficult for defendant to assist

defense counsel, the court concluded that defendant "is as competent as he is ever going to be."

## B.

The preceding facts demonstrate that there was never any in-depth inquiry into whether defendant was competent to stand trial. As I stated in my dissent in *Lockwood*, it is not enough that a defendant is oriented to time and place and has some recollection of events surrounding the crime. 160 Vt. at 566, 632 A.2d at 666 (Johnson, J., dissenting) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)). Rather, the critical inquiry is whether the defendant has the *capacity* to understand the nature of the proceedings, to consult with counsel, and to assist counsel in preparing a defense. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). The competence test approved by the United States Supreme Court and accepted in most jurisdictions is whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.'" *Dusky v. United States*, 362 U.S. at 402.

The revised ABA Mental Health Standards also adopted this test and recognized that incompetence to stand trial may arise from mental retardation as well as mental illness. See ABA Mental Health Standard 7-4.1(b), (c). As the commentary to that section notes, a determination of competence under the *Dusky* test should be "functional," requiring "an evaluation of a particular defendant's skills rather than a general determination of that defendant's mental condition." *Id.*, commentary at 173; see also Ellis & Luckasson, *supra*, at 455 (while presence or absence of mental retardation may be significant in evaluating competence, "the ultimate question is the actual ability of the individual defendant to perform tasks required at trial"). Thus, in the case of a mentally retarded defendant, both expert witnesses and courts "must inquire into the manner in which the defendant's retardation impairs his ability to perform the functions required of a competent defendant." Mickenberg, *Competency to Stand Trial and the Mentally Retarded Defendant: The Need for a Multi-Disciplinary Solution to a Multi-Disciplinary Problem*, 17 Cal. W.L. Rev. 365, 391 (1981).

Accordingly, medical health evaluators should address their diagnoses to the effects of a mental deficiency upon the ability of a defendant to perform the specific skills that define competence to

stand trial. *Id.* at 381. Similarly, courts should insist not only on an evaluation of the extent of the defendant's retardation, but also on a detailed description of its effects on the defendant's cognitive abilities, and an explanation of how these effects might impair the defendant's ability to participate in a trial. Ellis & Luckasson, *supra*, at 457. "Only this kind of detailed, nonconclusory testimony will allow the court itself to retain the ultimate decision on competence rather than merely deferring the decision to evaluators whose expertise does not extend to the nature of the trial process." *Id.*

Regrettably, the facts of this case illustrate every recognized mistake made by health evaluators and courts in determining competence. First, neither in his report nor at the competence hearing did Dr. Robbins provide detailed information concerning defendant's mental limitations or what effect those limitations might have on specific abilities needed to stand trial. See *State v. Bennett*, 345 So. 2d 1129, 1138 (La. 1977) (conclusory reports by evaluators that defendant was able to assist counsel were not entitled to reliance by the court absent supporting information, which was lacking at the hearing). Indeed, some of the comments in Dr. Robbins' report—that defendant is a poor historian regarding dates and has a poor memory—suggest defendant's mental limitations might affect his ability to stand trial. See *State v. Hamilton*, 373 So. 2d 179, 183 (La. 1979) (doctor's description of mentally retarded defendant as a "bad historian" was significant because defendant would have to reconstruct past events and aid defense counsel in finding witnesses); Mickenberg, *supra*, at 393 (mentally retarded persons often have difficulty recalling numbers, addresses, dates and times, which could have significant impact on trial competency skills).

Second, the court accepted the evaluator's conclusory report and testimony without further inquiry based, for the most part, on its confidence in the evaluator. In effect, the court improperly deferred the competence decision to the evaluator. See *State v. Weber*, 364 So. 2d 952, 957 (La. 1978) (court appears to have based its competence ruling on acceptance of experts' conclusions rather than examination of relevant factors; only court, not doctor, is qualified to make competence ruling); *State v. Bennett*, 345 So. 2d at 1137 ("trial court may not rely so extensively upon medical testimony as to commit the ultimate decision of competency to the physician"). Further, the court accepted Dr. Robbins' subsequent evaluation based on an oral statement made to a court employee rather than on court testimony or a written report admitted into evidence. Cf. *Jones v. State*, 372 A.2d

1064, 1067 (Md. 1977) (court violated statute by resting its determination of competence on matters outside record).

Third, the court's statement that defendant "is as competent as he is ever going to be" suggests that it based its competence ruling, in part, on the fact that, unlike a mentally ill person, defendant's ability to stand trial could not improve over time and, therefore, defendant would be immune to trial. Setting aside the issue of whether this assumption is true, it is clearly the wrong standard to apply in determining competence. The primary issue is not whether the defendant may be competent at some point in the future, but rather whether the defendant possesses the cognitive skills necessary to stand trial at that point in time. The court's statement is another example of how courts in general tend to focus on mental illness and sanity and ignore mental retardation. See *Lockwood*, 160 Vt. at 577, 632 A.2d at 673 (Johnson, J., dissenting).

Finally, the court erred by not holding another competency hearing. I believe both our statutory law and due process required a renewed hearing. See 13 V.S.A. § 4817. Section 4817 provides that an evidentiary hearing "shall be held" if an accused or an attorney acting on behalf of the accused raises at any time before trial the issue of whether the accused is competent to stand trial. Certainly, a hearing was required here where defense counsel stated that defendant's passivity and limited communication skills and intellect prevented effective communication with defendant.

In affirming the trial court's denial of defendant's request for a continuance and further psychological testing in order to reexamine his competence to stand trial, the majority states that defendant failed to provide new evidence of his incompetence at a hearing on his motion for another competency hearing, that further psychological testing was unnecessary considering that defense counsel had abandoned an insanity defense, and that there was no prejudicial error because defendant received "a vigorous and competent defense." The first response misses the point, which is that defendant *never* got a second competency hearing. Rather, the day after he filed his motion to continue, he got a hearing to determine if he would get a continuance for further testing. The hearing did not include any witnesses or evidence regarding competence, apart from the trial court's statement that Dr. Robbins had informed a court employee that defendant was still competent. See *Blunt v. United States*, 389 F.2d 545, 547 (D.C. Cir. 1967) (at minimum, competence hearing must give parties opportunity to examine all witnesses who testify or

report on accused's competence). Thus, the court denied defendant the opportunity to obtain additional evidence regarding his competence through further psychological testing, and now the majority states he was not entitled to another hearing because he did not present new evidence of his incompetence at a hearing in which he sought further testing.

The majority's other two responses make no sense to me. The fact that defense counsel would not be employing an insanity defense is irrelevant. Defense counsel wanted psychological testing to determine whether defendant was competent to stand trial, not to determine whether he was sane at the time of the offense.[9] Finally, defendant did not receive a vigorous and competent defense, at least with respect to the issues raised on appeal, as exemplified by defense counsel's failure to explore, either by expert testimony or cross-examination, defendant's cognitive limitations and their effect on his ability to stand trial.

Apart from the statute, due process required a second hearing. When there is evidence that raises a bona fide doubt as to competence, the court is required to hold an evidentiary hearing. *Pate v. Robinson*, 383 U.S. 375, 385 (1966); see also *Silverstein v. Henderson*, 706 F.2d 361, 369 (2d Cir.) ("trial court must order a hearing when there is 'reasonable ground' for believing that the defendant may be incompetent"), *cert. denied*, 464 U.S. 864 (1983); *Hill v. State*, 473 So. 2d 1253, 1256 (Fla. 1985) (same). The ABA Mental Health Standards recommend that courts conduct an evidentiary hearing "[i]n every case in which a good faith doubt of the defendant's competence to stand trial has been raised." ABA Mental Health Standard 7-4.7. The

---

[9] The majority also points out that the statute refers to an evaluation and report to be submitted by an examining psychiatrist, not a psychologist. This is another indication of how the legal system fails to distinguish between mentally ill and mentally retarded defendants. See *Lockwood*, 160 Vt. at 569, 632 A.2d at 668 (Johnson, J., dissenting). Given the historic focus on mental illness rather than mental retardation, it is not surprising that excessive reliance has been placed on psychiatrists to evaluate mentally retarded defendants, even though psychiatrists themselves have acknowledged the limitations of their expertise regarding mental retardation. Ellis & Luckasson, *supra*, at 484–85. Indeed, psychiatrists often have little understanding of the special needs and characteristics of persons with mental retardation. Accordingly, the ABA Mental Health Standards recognize that mental retardation professionals, including special education teachers, speech and language pathologists, audiologists, physical therapists, occupational therapists, and certain psychologists and clinical social workers, may be quite helpful in evaluating a mentally retarded defendant's ability to communicate, understand and learn. See ABA Mental Health Standard 7-1.1, commentary at 7, and 7-3.12, commentary at 145; see also Ellis & Luckasson, *supra*, at 485–86.

commentary to Standard 7-4.7 recommends that a hearing be deemed an "absolute right" when competence is at issue. *Id.*, commentary at 203.

Here, defense counsel's statements regarding defendant's passivity and limited communication skills, combined with information concerning prior evaluations, created more than a reasonable doubt about defendant's competence to stand trial. Indeed, the court itself recognized this fact, which prompted the second evaluation. See *Beans v. Black*, 605 F. Supp. 342, 345 (D. Neb. 1984) (fact that judge ordered psychiatric evaluation may be enough to establish sufficient doubt regarding competence to require hearing under *Robinson*), *aff'd*, 757 F.2d 933 (8th Cir.), *cert. denied*, 474 U.S. 979 (1985). Although the trial court does have discretion whether to hold a competence hearing, *State v. Welch*, 159 Vt. 272, 277, 617 A.2d 427, 430 (1992), compelling due process concerns require that we examine the record carefully to determine if the court abused its discretion. *State v. Weber*, 364 So. 2d at 957. A careful review of the record here leaves little doubt that the court abused its discretion in ruling, without a hearing and based on a telephone call from the evaluator, that a mentally retarded defendant was competent to stand trial.

## IV.

As in *Lockwood*, my principal concern here is with fundamental constitutional values, not mere technicalities. The task of the judiciary is to assure that justice is done. In cases such as this, where the facts are contested, an essential prerequisite to the dispensation of justice is the accurate reconstruction of a past event—in other words, ascertainment of the truth. This, in turn, demands that we employ procedures that are most likely to aid in the search for truth, and that we reject those that are more likely to lead the search astray.

Confessions and other inculpatory statements in criminal trials have, for very obvious reasons, a powerfully persuasive effect on the jury. It is especially important, therefore, that the rules regarding the admissibility of such statements be designed to screen out those that are the products of mistake, misunderstanding, coercion, confusion, or self-delusion. The law must, if it is to be sensitive to these matters, take careful account of the cognitive and intellectual capabilities of persons whose inculpatory statements are to be put in evidence against them. Otherwise, there is a grave danger of convicting the innocent.

I fully recognize that it is neither easy nor expedient to implement procedures that will effectively safeguard the rights and dignity of

defendants of limited mental abilities. But it is also the integrity and dignity of the judicial system itself that is at stake here, for the system will be judged more on its treatment of the least of us than on its efficiency in dealing with everyone else. By this measure, today's decision falls short of the ideals to which we should aspire.

I would suppress defendant's inculpatory statement and reverse the conviction. I would remand the case for a new competence hearing and for a new trial, if defendant is found competent.

