22 A.3d 410 (2011)
2011 VT 9
In re M.A.
No. 09-081.
Supreme Court of Vermont.
January 28, 2011.
Motion for Reargument Denied February 28, 2011.
*411 David W. Gartenstein, Windham County Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.
Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellant.
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
BURGESS, J.
¶ 1. Defendant, M.A., appeals a district court order placing him in the custody of the Commissioner of Disability, Aging and Independent Living (DAIL). Defendant had been charged with sexual assault and lewd or lascivious conduct with a child, but was ruled incompetent to stand trial. The district court found, under 18 V.S.A. § 8839,[1] that defendant presented a danger of harm to others, was "`in need of custody, care and habilitation'" and that the Commissioner could provide defendant placement in a program meeting defendant's needs. Defendant contends the order must be vacated for lack of jurisdiction in the district court and because there was insufficient evidence to support a finding *412 that he presents a danger of harm to others. We affirm.
¶ 2. In February 2004, Detective Anderson of the Bellows Falls Police Department commenced an investigation into two reports of possible sexual abuse of a nine-year-old girl. Detective Anderson, accompanied by an investigator from the Department for Children and Families (DCF), met with the child, known in the record as H.H., her mother, and a relative about their relationship with the then thirty-year-old defendant. Detective Anderson learned that defendant, whom the parties later stipulated suffered from mild mental retardation, spent a great deal of time alone with H.H. He also learned that at times defendant's behavior, including inappropriate touching, was concerning to her mother and others; that defendant's touching, as described by H.H., felt "weird" and "not good" to her; and that H.H.'s relationship with defendant began when she was approximately six. During these initial interviews, there was no explicit disclosure of sexual abuse.
¶ 3. Shortly after meeting with H.H., Detective Anderson intercepted defendant on his way to visit H.H.'s relative and requested an interview about the child. At Anderson's request, defendant drove himself to the police department. There, defendant sat at a table with both Detective Anderson and the DCF investigator in a chair next to the open door of the interview room. Detective Anderson informed defendant he was not under arrest and was free to leave at any time. Defendant indicated he understood, and that he was willing to speak with the detective.
¶ 4. Over the next four hours, in a videotaped interview, defendant admitted to sexually molesting two other girls; stated he was in love with H.H.; and admitted to sexual contact with H.H. including kissing, digital intercourse, vaginal intercourse, and ejaculating with her on his lap. Defendant also acknowledgedwhile describing individual assaultsthat he "probably shouldn't have touched her," that H.H. appeared uncomfortable, that his relationship with H.H. was inappropriate, and that he worried about going to jail. Detective Anderson elicited many of these admissions through leading questions, by indicating he already knew what had happened, implying that he had conducted or would conduct a medical exam of the child, and assuring defendant that the substance of the interview was private and "you're not in trouble anyways." Toward the end of the interview, defendant produced a letter he had written for H.H., which states:
I love you with all my heart I dont want to lose you so dont worry SRS[2] Dont have A thing on me because if they Did I would not be able to see my Mother not ever . . . I will be back soon I want to be there with you right know but I can't . . . Love [M.] forever
(Grammatical and other errors in original.) The bottom of the letter next to defendant's signature is decorated with twenty-one hand-drawn hearts. At the conclusion of the interview, defendant was placed under arrest, handcuffed, and taken into custody. Defendant was charged, and released on conditions to his mother's custody.
¶ 5. Prior to his trial date, defendant sought to suppress his statements as involuntarily made and the result of oppressive interrogation techniques and his intellectual limitations. The district court found it highly unlikely that the detective would not have recognized defendant's lower than average cognitive abilities, but *413 determined that the detective's persistent and sophisticated interviewing technique was neither abusive nor threatening. Judging from the videotaped interview, the district court was satisfied that the detective did not veer from the "limits of the `generally recognized' latitude afforded to law enforcement officers" in interviewing suspects. Finding that defendant failed to demonstrate any objective coercion, the court considered the effect of defendant's mental retardation on the voluntariness of his admissions. Based on the videotaped interview and opinions of mental health experts, the district court concluded that the record did not show that defendant lacked understanding of the subject matter and purpose of the interview or of the criminal implications of his admitted behavior. Holding the confession to be voluntary, and not the product of unduly manipulative or coercive psychological interrogation techniques, the court denied the motion to suppress, and the case proceeded to trial.
¶ 6. At jury selection, defense counsel raised a concern about defendant's competency to stand trial. The district court ordered an evaluation and appointed Dr. Paul Cotton to make an assessment. Dr. Cotton found defendant "incapable of moving beyond a simple fact[,] . . . incapable of considering explanations other than his own for a given fact," and unable to grasp the meaning of a plea agreement or the trial process, including what a jury does and how they weigh evidence. Based on Dr. Cotton's testimony, the court was satisfied defendant could not consult with his lawyer with a reasonable degree of rational understanding or appreciate the proceedings against him.
¶ 7. The court concluded defendant was incompetent and ordered a placement hearing to determine if he should be placed in the custody of the DAIL Commissioner. Over defendant's objection that the family court had exclusive jurisdiction over Act 248 proceedings, placement hearings were held in district court beginning in June 2008 and continuing over several months. Detective Anderson testified at the hearing, as did H.H. and a sociologist called by the defense as an expert in police interrogation.
¶ 8. In its written ruling, issued in January 2009, the court adopted the findings on voluntariness from the previous order denying defendant's motion to suppress and concluded that, although the police questioning was at times "intense," it was not overbearing or coercive and did not render the admissions involuntary. The court also rejected the expert's suggestion that the "motivational tactics" employed by the investigating officer rendered the responses unreliable, noting their essential consistency with the victim's statements and testimony. The trial court thus found by clear and convincing evidence that defendant had committed sexual assaults and lewd or lascivious behavior against H.H., and was therefore a danger to others within the meaning of the placement statute, 18 V.S.A. § 8839(3)(B), and ordered his placement in the custody of the Commissioner. This appeal followed.
¶ 9. We review a trial court's placement determination for clear error. See State v. Bean, 171 Vt. 290, 295, 762 A.2d 1259, 1262 (2000). Title 13 requires consideration of protective custodial placement and treatment for criminal defendants determined to be incompetent to stand trial. See 13 V.S.A. § 4820(4) (providing, in pertinent part, that when a criminal defendant is found incompetent to stand trial due to mental defect, "the court before which such person . . . is to be tried. . . shall hold a hearing for the purpose of determining whether such person should be committed to the custody of the commissioner *414 of mental health").[3] The necessary basis for the court to order placement is clear and convincing evidence of defendant's mental retardation, dangerousness to others, and availability of least restrictive appropriate treatment. 18 V.S.A. § 8843(c) (stating that upon finding defendant in need of custody, court shall order placement in "a designated program in the least restrictive environment"); id. § 7616(b) (imposing the State's burden of proof by "clear and convincing evidence"). At the merits hearing, the parties here stipulated to defendant's mental retardation. Aside from his objections to the district court's jurisdiction to hear the case, defendant's appeal is limited to contending that the State failed to meet its burden to prove he poses a danger of harm to others. 18 V.S.A. § 8839(1).[4]
¶ 10. Because "jurisdiction is a prerequisite to the power of a court to hear a case," Soucy v. Soucy Motors, Inc., 143 Vt. 615, 620, 471 A.2d 224, 227 (1983), superseded by statute on other grounds as stated in State v. Willis, 145 Vt. 459, 494 A.2d 108 (1985), we first address the jurisdiction of the district court to order placement under Act 248. The trial court read the Family Court Act, 1989, No. 221 (Adj.Sess.), as establishing jurisdiction only over voluntary and involuntary mental health-related commitment proceedings commenced independently of, and not arising from, a criminal prosecution in a criminal court.[5] Accordingly, the district court concluded it retained jurisdiction over defendant's commitment proceeding as originating out of the underlying criminal prosecution in that court. The court found support in the part of the statute providing that:
When a person charged . . . with a criminal offense:
. . . .
(2) Is found upon hearing pursuant to section 4817 of this title to be incompetent to stand trial due to a . . . mental defect . . .
. . . .
. . . the court before which such person is tried or is to be tried for such offense, shall hold a hearing for the purpose of determining whether such person should be committed to the custody of the commissioner . . . .
13 V.S.A. § 4820.
¶ 11. Defendant argues here, as below, that after the family court was founded in 1990, the Family Court Act requires all Act 248 hearings to be held only in the family court. Defendant asserts that the exclusive jurisdiction of the family court is *415 set forth in the sweeping declaration within the Family Court Act that, "[n]otwithstanding any other provision of law to the contrary," all "proceedings filed pursuant to chapter 206 of Title 18," also a part of Act 248, are to be heard and disposed of in family court. 4 V.S.A. § 454. Defendant contends, essentially, that the extension of family court jurisdiction to "[a]ll care for mentally retarded persons proceedings filed pursuant to chapter 206 of Title 18" under 4 V.S.A. § 454 means all Act 248 commitment cases, including those commenced in criminal court pursuant to § 4820 of Title 13. Conceding that other parts of Act 248 address placement proceedings in criminal court, defendant points out that the Family Court Act was enacted after Act 248 and so supersedes the latter jurisdictionally.
¶ 12. Reconciliation of defendant's perceived jurisdictional competition between the district and family courts in this matter lies in a plain reading of the statutes, giving effect to all of their provisions. See In re S. Burlington-Shelburne Highway Project, 174 Vt. 604, 605, 817 A.2d 49, 51 (2002) (mem.) (when construing complex statutory scheme, our goal is to harmonize the statutes and give effect to all of their constituent parts). It is clear that the Legislature here intended mental health and retardation commitment proceedings "filed pursuant to" Title 18 to be initiated and disposed of in the family court. 4 V.S.A. § 454(11), (13). It is no less clear that the Legislature intended the question of custodial care and treatment for persons deemed incompetent to stand criminal trial to be heard in the same court that determined the person incompetent. 13 V.S.A. § 4820. There is no conflict between these two provisions since family court jurisdiction expressly lies for cases filed pursuant to Title 18, while commitment cases arising under Title 13 are not filed at all, but proceed automatically from the criminal court's finding of defendant incompetence in the course of an underlying criminal prosecution.[6] As the statutes are neither ambiguous nor incompatible in their alignment, no further interpretation is required. See In re Estate of Cote, 2004 VT 17, ¶ 10, 176 Vt. 293, 848 A.2d 264 (where legislative intent can be ascertained from its plain meaning, the statute *416 must be enforced according to its terms without resorting to statutory construction). Accordingly, we conclude that the district court properly exercised jurisdiction in this matter.
¶ 13. In his second claim on appeal, defendant contends there was insufficient evidence that he presented a danger of harm to others as required to support a placement in the care of the DAIL Commissioner. The foundation for defendant's argument is that his confession during the interview with investigators was unreliable because his mental deficiencies rendered him easily overborne by extensive, coercive questioning. Led and manipulated into confessing, defendant argues he made involuntary admissions which should be accorded no evidentiary weight. Defendant claims that the remaining evidence, H.H.'s testimony, was also unreliable because it was "inconsistent and incredible."
¶ 14. The State and defendant agree that for purposes of involuntary commitment the trial court was required to find by clear and convincing evidence that defendant posed a danger to others. Engaging in either lewd or lascivious conduct or sexual assault would be sufficient evidence of that risk under Act 248. 18 V.S.A. § 8839(1) (defining danger of harm to others to "mean[ ] the person has . . . committed an act that would constitute a sexual assault or lewd or lascivious conduct with a child"). The trial court made its findings by clear and convincing evidence that H.H. was abused and subjected to lewd or lascivious conduct by defendant.
¶ 15. Against the standard of clear and convincing evidence, our review remains deferential:
The test . . . is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable. . . . Only where the record indicates that the trial court "clearly erred" in finding clear and convincing evidence will this Court reverse such a finding.
In re E.T., 2004 VT 111, ¶ 13, 177 Vt. 405, 865 A.2d 416 (quotation omitted). In assessing findings of fact challenged on appeal, "our role is limited to determining whether they are supported by credible evidence," while credibility and weight are left to the sound discretion of the trial court. In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993). In making that determination, we review the evidence in the light most favorable to the State. State v. McCarty, 2006 VT 4, ¶ 12, 179 Vt. 593, 892 A.2d 250 (mem.).
¶ 16. While defendant disagrees with the trial court's determination that his statements were voluntary and reliable, he does not dispute the underlying evidence cited by the court in support of its findings. As earlier summarized, the trial court here believed the testimony of H.H. concerning the assaults, and found H.H. and defendant's respective versions of the events to be corroborative. Moreover, defendant's inculpatory love letter to H.H., authenticated by him, was evidently penned independently and before the investigator's interview.
¶ 17. In attacking the reliability of his admissions, defendant reiterates the expert's testimony below to the effect that his low intellectual ability was no match for the detective's interrogation techniques so that his responses were practically coerced. Both courts below, however, found that the officer's questioning techniques, while "persistent" and "sophisticated," were not "abusive or threatening" and contained no "improper promises of leniency, or undue psychological trickery," and that defendant's will was not overborne.
*417 ¶ 18. The district court, as the trier of fact, was best positioned to evaluate the credibility of the witnesses and the weight to be assigned their testimonyincluding that of defendant's expertand its findings will not be disturbed absent a showing of clear error. State v. Fairbanks, 123 Vt. 298, 300, 187 A.2d 335, 336-37 (1963). Defendant has not shown that the trial court's findings concerning the absence of coercion were clearly erroneous. Furthermore, there is no basis in either the law or the facts presented to conclude that defendant's cognitive limitations, standing alone, rendered his statements involuntary or unreliable. See Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (coercive police conduct is necessary predicate to finding due process violation); State v. Ives, 162 Vt. 131, 134, 648 A.2d 129, 131 (1994) (same). Similarly, the court's reliance upon the testimony of H.H., especially as bolstered by defendant's confession, was within "the sound discretion of the [trial] court to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. at 178, 624 A.2d at 869. Hence we discern no basis to disturb the trial court's findings and conclusions.
Affirmed.
JOHNSON, J., concurring.
¶ 19. I agree that the district court properly exercised its jurisdiction in the Act 248 placement proceeding and that, given H.H.'s credible testimony coupled with corroborating statements made by defendant, the court could have found it highly probable that defendant, at minimum, engaged in lewd or lascivious conduct with H.H. and thus clearly and convincingly posed a danger of harm to others. Accordingly, I concur with the majority's mandate. I write separately, however, to emphasize my belief that (1) neither of the district court judges made a sufficient inquiry into whether defendant voluntarily confessed to policein that neither judge adequately considered the impact of acknowledged sophisticated interrogation techniques on the mentally retarded defendant; and (2) the record strongly suggests that those sophisticated techniques employed by the interrogating officer overcame defendant's will, resulting in an involuntary confession.
¶ 20. The parties stipulated that defendant was mildly mentally retarded for purposes of the Act 248 proceeding. Certainly, the record demonstrates that he functioned at no higher level than that. In his decision on defendant's motion to suppress, Judge Wesley noted that a 1993 assessment had found defendant's full-scale intelligence quotient (IQ) to be 65, indicating mild mental retardation. But a March 2004 letter from defendant's high school admitted into evidence stated that, based on the Wechsler intelligence scale for children, defendant had tested at a full-scale IQ of 52, just above the cutoff for moderate mental retardation. Likewise, in a written summation of his psychiatric evaluation of defendant in May 2007, Dr. Cotton noted that defendant had a full-scale IQ of 52, placing him in the lowest range of persons with mild mental retardation. In any case, as the district court found, defendant functioned below the first percentile of persons his age in the general population.
¶ 21. In his written evaluation, Dr. Cotton stated that defendant's mental deficits were typical of someone with his degree of mental retardation. According to Dr. Cotton, those deficits were most pronounced with respect to defendant's inability to manipulate abstract ideas and make judgments about both actions and thoughts. Therefore, defendant had "substantial difficulty with interpersonal judgment." Dr. *418 Cotton specifically cited the police description of defendant's "undue friendliness with Officer Anderson" as "another example of his inability to understand a situation, exercise rational judgment, and take appropriate behavior." The district court agreed, noting in its competency decision that defendant "has shown severely warped perceptions as to who is an advocate or ally, and who is an opponent. This was demonstrated by his view of Detective Anderson as his friend."
¶ 22. The court's finding on this point is painfully evident from even a cursory reading of Detective Anderson's four-hour interrogation of defendant. Detective Anderson started the interrogation by stating that "[w]e're not really doing investigations today." When defendant noted that someone else (presumably another officer at the police station) had told him that they were conducting an investigation, Detective Anderson responded that "[s]omebody gave you some bum scoop on that." In Detective Anderson's words: "We're just two guys" who are "[h]aving a conversation." Over the next four hours, Detective Anderson employed what the district court described as "sophisticated questioning techniques" designed to extract a confession from defendant. The main ploy adopted by Detective Andersonone that was startlingly effective on defendantwas to convince defendant that he (Detective Anderson) was his friend and confidante who understood, indeed sympathized, with his predicament.
¶ 23. One must watch the videotape or read through the entire 243-page transcript to fully appreciate the effectiveness of Detective Anderson's unrelenting techniques in turning defendant's initial denials of sexual contact with H.H. and other young women into direct acknowledgement of a variety of criminal acts. To attain this result, as the district court found, Detective Anderson made repeated statements, many untruthful, aimed at convincing defendant that, among other things: (1) he was on defendant's side; (2) he did not find personally offensive, or even criminal in nature, some of the sexual contact that defendant had engaged in with H.H. and others; (3) he would help defendant if defendant helped him; (4) he was highly trained to detect when people were lying, and he knew when defendant was lying; (5) he asked only questions to which he knew the answers; and (6) H.H. and others had talked to him about the sexual contact defendant had had with them.
¶ 24. Early on in the interview, Detective Anderson stated: "I'm a good person, and I'm not out to get you." Detective Anderson told defendant that the only important thing is that "when you walk out of here today, and you understand that you're walking out of here today? . . . I want to know that what you told me is true." Continuing his theme that they were buddies just having a conversation, Detective Anderson further stated: "And you know what? You and I probably don't think a hell of a lot differently. . . . We probably think about things very similar. . . . And you and I, being the guys that we are, okay, we think about the same way. I'm no different than you are." Detective Anderson immediately expanded on this theme: "So I know exactly what you're thinking, and, frankly, I don't have any problem with it. Okay?"
¶ 25. When defendant initially denied sexual contact with another girl thought to be underage at the time of the contact, Detective Anderson assured defendant that "it's no big deal" and suggested that she may have been playing "hard to get." Detective Anderson continued his "buddy" role when discussing in great detail defendant's presumed foreplay with the girl, at one point asking if defendant was able to *419 remove a bra with one hand. When defendant responded that he was unable to do so, Detective Anderson admonished him: "You need to practice."
¶ 26. For the most part, defendant seemed oblivious to what he was admitting to or to whom he was admitting it. When, on occasion, defendant mentioned anything about getting into trouble, Detective Anderson would quickly return to the theme that the "interview" was about truth and honesty and not about getting into trouble. On such occasions, he would reiterate: "The door is open. I told you you weren't under arrest. . . . I told you that you could get up and leave. I let you drive down here." Detective Anderson further explained: "I think that you're worried about what's going to happen if you tell me the truth, and what I'm telling you is that you don't need to worry about that. Did you ever hear the expression `the truth will set you free?'"
¶ 27. When Detective Anderson started talking about defendant meeting six-year-old H.H. for the first time, he asked defendant without sarcasm: "Love at first sight?" Defendant responded that he did not know at that point "if I loved her enough to marry her or anything right off. I mean if she was my age, yes. But she's not." Detective Anderson responded: "Well, I'mI mean Sarah [who was either 15 or 16 at the time defendant allegedly had sexual contact with her] wasn't your age either . . . ." When defendant explained that Sarah was closer to his age, Detective Anderson agreed, but noted that "little kids today aren't like little kids when I was growing up or even little kids when you were growing up. Kids today arethey grow up a lot faster." Defendant agreed, noting that H.H. had grown to nearly his height since he first met her when she was six years old. Ignoring defendant's failure to grasp his meaning and not missing a beat, Detective Anderson added: "And she sure don't behave like a little kid? She really behaves like a young adult?"
¶ 28. Noting that H.H. "is something else," Detective Anderson expressed sympathy that "you guys can't get together yet. You think it's going to happen though?" When defendant said he did not know, Detective Anderson asked why not, saying that he bet defendant felt strongly about her, more so than he did about Sarah. After defendant reiterated that he could not marry her now, Detective Anderson agreed, "[n]ot yet," but added: "The time's coming." Detective Anderson stated that he talked to people all the time that are in love with younger people, noting that sometimes they even act on it. Detective Anderson, explained, however, "what concerns me is what's the quality of the relationship. Does the girl want the relationship? Does she participate in the relationship? Okay. And clearly [H.H.] does."
¶ 29. At one point, defendant reached into his pocket and produced a "love letter" that he had written to H.H. Detective Anderson suggested that it was okay for him to love her, saying: "I don't think that you are forcing her to do anything, [M.]. I think that everything that you have done in your relationship with [her], you did it because she wanted it." Detective Anderson explained to defendant that he was likely to get into trouble by keeping things secret "as opposed to putting things out there and saying, you know what? I love [H.H.]. You don't want to be married to [H.H.]?" Detective Anderson stated that it was "clear" to him from talking to everyone "that you feel very strongly about [H.H.]. That your feelings are genuine, and they are real, and she feels the same way about you. Why should you hide from that? Why should she have to hide from *420 that?" Returning to his theme that it was okay for defendant to speak to him as a friend, Detective Anderson stated: "But right now, this is you and me. There's no other cops. There's no bosses. There's not lawyers. There's no State's Attorney. There's no Judges. It's just you and me talking."
¶ 30. Detective Anderson eventually moved on to defendant's interactions with other young girls at an elementary school. When Detective Anderson asked how it happened that he was discovered holding hands with one particular girl, defendant stated that she liked him and just came up to him and started holding hands with him. Detective Anderson's response, in his role as conspiring buddy, was: "You are about the luckiestyou are a stud. You know that? You're a stud."
¶ 31. Incredibly, Detective Anderson testified at the suppression hearing that he did not recognize defendant's mental deficiencies during his "interview" of defendant. The videotape and transcript of the interrogation, however, strongly support Judge Wesley's skepticism on this point. As defendant's expert testified at the Act 248 proceeding, individuals having a mental capacity within the normal range would have rejected as ridiculous Detective Anderson's feigned understanding of, and sympathy to, notions such as that the quality of the relationship, rather than the age difference, is the important thing in a "love" relationship between a thirty-year-old adult and a six-year-old child. According to the expert, Detective Anderson felt that he could get away with presenting notions such as this based upon his assessment of the target. Given defendant's evident mental limitations, particularly his hyper-suggestibility, Detective Anderson's strategy of building and nurturing a false sense of camaraderie worked perfectly. As Judge Hayes later found, defendant's warped perceptions of who is an ally and who is an adversary led him to view Detective Anderson as his friend, which resulted in, as Judge Wesley so aptly put it, defendant's "placid complicity in his deepening self-incrimination."
¶ 32. "Excessive friendliness on the part of an interrogator," even with normal individuals, "in combination with other tactics, [] might create an atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt admissions that the suspect would ordinarily make only to a friend, not to the police." See Miller v. Fenton, 796 F.2d 598, 607 (3d Cir.1986). In this case, that effect was highly exacerbated because of the susceptibility of the mentally retarded defendant. Experts, including the expert in this case, have documented the heightened vulnerabilities and susceptibilities of defendants with mental retardation to tactics such as those employed by Detective Anderson. See J. Ellis & R. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.Rev. 414, 428-32 (1985); see also State v. Ives, 162 Vt. 131, 152-53, 648 A.2d 129, 142 (1994) (Johnson, J., dissenting) (citing authorities and detailing tendencies that make mentally retarded suspects extremely vulnerable to interrogation tactics aimed at obtaining confession). Because of their tendency to want to appease authority figures or mask their lack of understanding or uncertainty regarding past events, mentally retarded persons are far more likely than higher-functioning individuals to respond to questioning based on what they believe the questioner is looking for rather than on their actual memory of what occurred. See State v. Lockwood, 160 Vt. 547, 569, 632 A.2d 655, 668 (1993) (Johnson, J, dissenting) (citing Ellis & Luckasson, supra, at 428-30).
*421 ¶ 33. For their part, police, of course, are trained to use certain tactics during an interrogationsuch as positing guilt as a fact, minimizing the moral seriousness of the offense, casting blame on society in general, and alternating between befriending and cajoling the suspectthat will break down a suspect's defenses by working on individual weaknesses, thereby obtaining a confession. See Miranda v. Arizona, 384 U.S. 436, 448-55, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In the context of interrogating individuals who are not mentally retarded, tactics such as these are generally considered acceptable under the law. See State v. Bacon, 163 Vt. 279, 293-94, 658 A.2d 54, 64 (1995) (noting that police may use some psychological tactics in eliciting statements from suspects so long as suspect's decision to confess results from suspect's own balancing of competing considerations).[7] Moreover, the United States Supreme Court has held that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
¶ 34. But "`[t]he limits [of permissible questioning tactics] in any case depend upon a weighing of the circumstance of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.'" Miller, 796 F.2d at 611 (quoting Stein v. New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953)). In examining the voluntariness of a confession under the totality of the circumstances, we must ultimately consider whether the physical or psychological pressure placed on the defendant "`cause[d] the [defendant's] will to be overborne and his capacity for self-determination to be critically impaired.'" State v. Zehner, 142 Vt. 251, 254, 453 A.2d 1126, 1127 (1982) (quoting Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir.1977)).
¶ 35. The totality-of-the-circumstances approach recognizes the synergistic nature of interrogations in which police use a variety of subtle tactics to create an atmosphere that will break down the targeted suspect. In this case, as plainly evidenced by the videotape and transcript, the mentally retarded defendant was putty in the hands of Detective Anderson, who befriended defendant, convinced him that they were buddies, lied to him about what police knew, minimized the sexual contact between H.H. and him, and then badgered him into providing details of that contact.
¶ 36. In the criminal context, this confession should have been suppressed. In admitting the confession, Judge Wesley focused on facts such as that defendant "was questioned in an open environment," that Detective Anderson "was not in uniform," that "no other police officers participated in the interview," that defendant "never gave any indication of wanting to terminate the encounter," and that defendant "remained cooperative and *422 seemingly unruffled." But no show of force was necessary, or even desirable, in these circumstances, given the police strategy of befriending defendant. It was not the intimidating power of the State that overcame defendant's will, but rather the interrogator's successful strategy of convincing defendant that he (the interrogator) was an ally rather than an adversary. Indeed, if anything, the facts noted by Judge Wesley further demonstrate that Detective Anderson successfully employed his strategy of convincing defendant that he was a friend, which is consistent with both Judge Hayes's finding that defendant viewed Detective Anderson as his friend and Dr. Cotton's conclusion that defendant's "undue friendliness" with Detective Anderson stemmed from his mental retardation.
¶ 37. As noted, Judge Wesley explicitly recognized defendant's "placid complicity in his deepening self-incrimination." The court was not persuaded, however, that defendant's mental retardation led to this complicity because the record demonstrated that defendant understood both the subject matter of Detective Anderson's inquiries and the implications of his responses to those inquiries. I agree that, for the most part, defendant understood the surface meaning of the detective's inquiries and also knew, at least at some level, that his sexual contact with H.H. was wrong. But the court made little inquiry into critical questions such as: What exactly were defendant's mental limitations? How did those limitations make him susceptible to the specific tactics employed by Detective Anderson? To what extent were those tactics successful, given defendant's mental limitations? And, most importantly, did those limitations compromise the reliability of his responses? Obviously, defendant's mental limitations were significant enough that Detective Anderson felt he could extract a confession from defendant by convincing him, even if only temporarily, of notions such as that having sexual contact with a young child was okay as long as it was a "quality relationship" not forced upon the child.
¶ 38. We have held that a person under eighteen years of age is entitled to have an adult interested in protecting the juvenile's rights present before agreeing to a custodial interrogation. State v. Piper, 143 Vt. 468, 473, 468 A.2d 554, 557 (1983); see In re E.T.C., 141 Vt. 375, 379, 449 A.2d 937, 940 (1982). We reasoned in Piper that "a mature decision cannot be made by a minor who is isolated, ignorant of his rights or intimidated by his surroundings." 143 Vt. at 473, 468 A.2d at 557. As I stated in Ives, the rationale for our decision in E.T.C. "was that minors hold a protected status in our society, which has recognized that juveniles often lack the capacity and responsibility to realize the full consequences of their actions." 162 Vt. at 154, 648 A.2d at 143 (Johnson, J., dissenting). Much the same can be said for persons with mental retardation. I continue to believe that, in most, if not all, instances, interrogating a mentally retarded defendant without the presence of an interested adult (and, notwithstanding any ruling to the contrary, this was plainly an interrogation of a suspect regarding a specific crime) cannot satisfy the totality-of-the-circumstances test for admission of a confession. See id. at 153, 648 A.2d at 142 (Johnson, J., dissenting). Certainly here, in making its voluntariness decision, the district court failed to make a detailed context-specific inquiry into the suspect's cognitive deficiencies and the potential impact of the interrogator's tactics in light of those deficiencies.
¶ 39. As I stated at the beginning of this concurrence, however, I would not reverse the district court's decisionin the context of this Act 248 proceedingto *423 place defendant in the custody of the Commissioner of Disability, Aging and Independent Living (DAIL). The court found H.H.'s testimony concerning the sexual contact between her and defendant to be credible and generally consistent, albeit with some expected inconsistencies. The court also found that several of defendant's statements made to police were consistent with H.H.'s testimony. These statements, along with defendant's "love letter," corroborated H.H.'s credible testimony, notwithstanding the general unreliability of defendant's confession. In short, there is clear and convincing evidence that defendant poses a danger of harm to others because the record supports the court's determination that it was highly probable that he engaged in, at minimum, lewd or lascivious acts with a child. See In re E.T., 2004 VT 111, ¶ 13, 177 Vt. 405, 865 A.2d 416 (noting that test on review in cases involving involuntary mental health treatment is whether factfinder could have reasonably concluded that required factual predicate was highly probable); 18 V.S.A. § 8839(1) (defining "[d]anger of harm to others" to include persons who commit acts that "would constitute a sexual assault or lewd or lascivious conduct with a child"); 18 V.S.A. § 8839(3) (defining person in need of custody as mentally retarded person who presents "danger of harm to others").
NOTES
[1] The court's hearing was what is commonly referred to as an "Act 248 proceeding," after the 1988 legislation generally revising the state's response to certain mentally retarded persons who pose a danger to others. 1987, No. 248 (Adj.Sess.).
[2] The Vermont Department of Social and Rehabilitation Services, or "SRS", preceded DCF as the state agency responsible for child protection services.
[3] While § 4820 refers only to the mental health commissioner, the next section makes clear that defendants deemed incompetent on account of mental illness may be subject to the custody of the mental health commissioner and the procedures for hearings in chapter 181 of Title 18. Defendants found incompetent due to mental retardation may be subject to the custody of the DAIL Commissioner pursuant to the "[p]rocedures for hearings for persons who are mentally retarded . . . as provided in subchapter 3 of chapter 206 of Title 18" (also known as "Act 248"). 13 V.S.A. § 4821. Subchapter 3 of chapter 206 of Title 18 includes 18 V.S.A. § 8839.
[4] Though contested below, respondent does not appeal the district court's determination that the assigned program meets his needs in the least restrictive environment possible.
[5] Although the instant commitment case evolved from a criminal prosecution in the district court, at the time, both the district and superior courts had jurisdiction over criminal cases. See 4 V.S.A. § 114 (superior court criminal jurisdiction); 4 V.S.A. §§ 439-440 (concurrent district court jurisdiction over felonies and misdemeanors). Hence our references to "criminal court" as the court from which post-incompetency commitment proceedings arise.
[6] The court below also cited 18 V.S.A. § 8840 in support of its rationale. Under the rubric "Jurisdiction and venue," § 8840 still provides that mental health proceedings "brought under this subchapter [of Title 18]. . . shall be commenced by petition in the district court." This section is inapposite to the instant case, however, since the commitment proceeding was not "brought" under Title 18, but followed the district court's determination that respondent was incompetent to stand trial under 13 V.S.A. §§ 4817 and 4820(2). Before the creation of family court in 1990, all Title 18 mental health commitments not arising from the criminal docket were filed in district court. Thus, the jurisdiction and venue provisions of § 8840 are among those included in the anachronistic "other provision[s] of law to the contrary" declared overridden by the new exclusive jurisdiction established in the family court under 4 V.S.A. § 454.

It is noteworthy, as well, that the supplement to Title 18 includes a "revision note" purporting to explain a revision to § 8840 that "[r]edesignated the venue for commitment proceedings for the mentally retarded from district court to family court to reflect the redesignation provided for in subdivision 454(13) of Title 4." Revision note2005, 18 V.S.A. § 8840. As published in the supplement, however, the entire text of § 8840 remains unchanged. Review of the Legislature's Acts and Resolves for 2005 and 2005 (Adj.Sess.) reflect no amendment to the statute. Thus, the note is curious, but not helpful. The question of revision is more substantive than a scrivener's error, since a revision of only the words "district" to "family" court would not change today's result, while omitting or changing its qualifying application to "[p]roceedings brought under this subchapter [of Title 18]" (emphasis added) could well affect the outcome.
[7] Although we have come to accept, as legitimate, police tactics such as lying to suspects, I find disconcerting Detective Anderson's conspiring attitude toward the mentally retarded defendant's prurient intereststhe worst examples of which are not quoted aboveand the jarring contrast between the detective's pleas for truthfulness and his own dishonest and disingenuous statements. To be sure, defendant is a person in need of treatment and should be in custody so that he can obtain the necessary treatment. But extracting a confession by befriending defendant and minimizing his criminal conduct was unnecessary in this case and can only be detrimental to helping defendant understand how his conduct was harmful.